## A. L. EGGLESTON v. THE STATE.

### No. 461.   Decided March 23, 1910.

### Rehearing denied June 8, 1910.

**1.—Murder—Charge of Court—Manslaughter—Harmless Error.**

Where, upon trial of murder, the evidence showed on the part of the State a deliberate killing, and upon the part of the defendant a clear case of self-defense, the issue of manslaughter was not raised, and there was no reversible error in the court's refusal to submit defendant's requested instruction on manslaughter, and any supposed errors, if any, in the court's charge upon the law of manslaughter were harmless.

**2.—Same—Charge of Court—Murder in the Second Degree.**

Where, upon trial of murder, the court's charge on murder in the second degree, taken as a whole, was not subject to the criticism made by the defendant, there was no reversible error.

**3.—Same—Charge of Court—Self-Defense—Reasonable Doubt.**

On trial of murder it was not necessary for the trial court in submitting the different issues raised by the evidence, to couple on to his charge the question of reasonable doubt on every issue.

**4.—Same—Charge of Court—Requested Charges.**

On trial of murder, there was no error in refusing defendant's requested charges not to consider the testimony of co-conspirators made after the homicide; and also with reference to remarks of State's counsel criticising the defendant for not offering defendant's shirt in evidence, which the latter claimed had been cut by deceased.

**5.—Same—Argument of Counsel—Legitimate Comments.**

Where, upon trial of murder, the defendant testified that the deceased cut at him with a knife and split the arm of the sleeve of his shirt, and that the shirt was in possession of his wife, but failed to introduce same, there was no error in State counsel's argument in commenting on the failure of defendant to introduce said shirt in evidence.

**6.—Same—Evidence—Coconspirators—Res Gestae—Conspiracy Pending.**

Upon trial of murder, where the evidence showed that the defendant and another were acting together in the commission of the homicide, and that immediately after the homicide they proceeded to the house of a third party nearby and had a conversation with the latter, whereupon the codefendant and said third party immediately returned to the scene of the killing and ran all the witnesses away from the body of the deceased and placed a knife by the side of the body of the deceased, etc., there was no error in introducing this testimony, both as res gestae and as the acts of coconspirators pending the conspiracy, after the commission of the crime, although defendant was not present.

EGGLESTON v. THE STATE.

7.—Same—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence sustained the conviction, the same will not be disturbed.

8.—Same—Harmless Error—Charge of Court—Provoking Difficulty.

Where, upon trial of murder, the evidence did not raise the issue of manslaughter, an error in the court's charge on manslaughter with reference to provoking the difficulty, which was not in the case, was harmless.

9.—Same—Evidence—Acts and Declarations of Third Parties.

Where, upon trial of murder, it was shown that immediately after the homicide defendant and his codefendant proceeded to the house of a third party nearby and had a conversation with the latter, whereupon defendant left and the other two returned to the scene of the homicide and ran away the witnesses from the body of deceased and placed an open knife near said body, etc., the acts and declarations of said third party after said homicide, as well as that of the codefendant, were original testimony and admissible in evidence, and such acts could be proved circumstantially.

Appeal from the District Court of Limestone. Tried below before the Hon. H. B. Daviss.

Appeal from a conviction of murder in the second degree; penalty, thirty-five years imprisonment in the penitentiary.

The opinion states the case.

*James Kimball* and *Doyle, Jackson & Harper,* for appellant.—On question of the court's charge on manslaughter and refusing requested charges: Castro v. State, 40 S. W. Rep., 985; Carter v. State, 30 Texas Crim. App., 551; Williams v. State, 25 Texas Crim. App., 216; Meuly v. State, 26 Texas Crim. Rep., 274; Ripley v. State, 51 Texas Crim. Rep., 126, 100 S. W. Rep., 943; Childers v. State, 33 Texas Crim. App., 509; Williams v. State, 15 Texas Crim. App., 617.

On question of the court's charge on deadly weapon: Gallagher v. State, 55 Texas Crim. Rep., 50, 115 S. W. Rep., 46; Burnett v. State, 46 Texas Crim. Rep., 116, 79 S. W. Rep., 550; Lindsay v. State, 36 Texas, 337.

On court's charge of self-defense: Phipps v. State, 34 Texas Crim. Rep., 560 and 608; Benson v. State, 51 Texas Crim. Rep., 367, 103 S. W. Rep., 911; Benson v. State, 56 Texas Crim. Rep., 52, 118 S. W. Rep., 1049; Winn v. State, 54 Texas Crim. Rep., 538, 113 S. W. Rep., 918; Watson v. State, 50 Texas Crim. Rep., 171, 95 S. W. Rep., 117.

On question of admitting in evidence acts of coconspirators and third parties: O'Quinn v. State, 55 Texas Crim. Rep., 18, 115 S. W. Rep., 39; Phillips v. State, 6 Texas Crim. App., 364; Ricks v. State, 19 Texas Crim. App., 308; Sessions v. State, 37 Texas Crim. Rep., 62, 38 S. W. Rep., 623.

*John A. Mobley,* Assistant Attorney-General, for the State.

McCORD, Judge.—This is an appeal from a conviction for murder in the second degree with a penalty of thirty-five years. On the 13th day of June, 1909, and on the night of said day, one Jake Ross, a negro, was living on the place of one Jackson, as tenant. This place was situated not far from the town of Coolidge, in Limestone County. On that night the said Ross gave a "festival," and there had assembled a good many negroes of the neighborhood. The appellant, in company with one Jess Goodwin, both white men, and also living on Jackson's place as tenants (Goodwin being a relative of Jackson), appeared at this negro "festival," and were gambling with the negro men. Shortly thereafter the deceased, Woody Clancy, appeared upon the scene in company with another white boy, went into the negro house and bought something to eat from the wife of Ross, and a difficulty ensued between him and the appellant and resulted in the said Clancy being shot and killed. Appellant, who was a married man, and some thirty-two years old, and Goodwin, who was a young man some twenty or twenty-one years of age, were separately indicted for this killing. The deceased, Clancy, was a boy who lived in the neighborhood, and was about twenty years of age. The deceased, Clancy, with one Ike Fralick and some other boys, had been at Mr. Barfield's, who lived about a quarter of a mile from where Jake Ross lived, attending a social gathering, when between 11 and 12 o'clock the deceased, in company with Fralick and Blunt, left Barfield's, and in going to their homes stopped at Jake Ross'. When the deceased appeared at the place the appellant and Goodwin stopped gambling with the negroes, and appellant bantered the deceased to play him a game of cards. The deceased remarked that he would play him pitch at anything from twenty-five cents to $100 a game. The appellant went off and came back to where the deceased was standing and told him that he could not find any cards; the deceased replied, "Well, that is all right; I was just joking anyway," or words to that effect. It may be here stated that the deceased and appellant were unacquainted with each other, and if they had ever met before there is no testimony to that effect. The State's theory of the case, and there was testimony to support it, was that the appellant and Goodwin were ruffled at the appearance of the deceased and the boys that were with him at the place that night, and that they suspected that these boys were there to prevent them from gambling with the negroes or to report on them for gambling. This theory is supported by the statement of one witness, who testified that just before the shooting Eggleston said that he, appellant, would go and start those God-damn yaps; that Goodwin remarked, "You better take this," and handed him a pistol, and also remarked that there were but three loads in it, and if he needed more he had better put them in; that when Eggleston said he was going around there to start the God-damn yaps the witness spoke up and says, "What God-damn yaps?" and Goodwin

said, "That Clancy boy." The witness said: "I think he is all right; he came in the house and told us boys that he would not gamble any more while these white boys were here, if he was us; that they might get us in trouble;" that Goodwin said, "He is the God-damn rascal," and about two minutes after this conversation the shooting occurred. The testimony further disclosed that after the arrival of the deceased, Blunt and Fralick there were four or five shots fired out back of the corner of the house, but the record fails to disclose who fired those shots. The witness Blunt said that he had started home after the firing of these shots and that when he got out to the fence, which was some fifteen feet in front of the house, Goodwin came to him and asked him where he was going; that he remarked that he was going home, and about that time Eggleston appeared, when Goodwin said, "Come here and get this, there is three cartridges in it;" that Goodwin then handed Eggleston the pistol; Eggleston then turned and went back towards the corner of the house; that Goodwin asked the witness if he had a gun, and the witness said he had one at home that was broken; the witness then turned and started towards home, and had gotten some fifty or sixty steps from the fence when the three shots were fired. The witness says that he and the parties had been in the house about ten or twenty minutes when the shooting occurred. The witness Holley testified that he is a negro, and that when he arrived at Ross' house that night the only white men that were there was appellant and Goodwin, and that there was gambling going on at the house between appellant and Goodwin and the negroes, and that this gambling stopped when deceased appeared upon the scene, together with his friends. This witness says he heard some shooting out of the house before the killing, but he did not know who did it; that after this shooting he, witness, came out on the gallery and he saw Goodwin and appellant out there; that when he went out on the gallery appellant sat down by him and slapped him on the back and said he, witness, was all right; that a party by the name of Shorty approached the appellant, Eggleston, and told him that there was somebody out behind the house and asked him who it was out there. Appellant got up, put his hand in his pocket and said he would go and start the God-damn yaps. Goodwin said, "You had better take this," and handed him a pistol. The witness asked who the yaps were that he had reference to, when Goodwin remarked "That Clancy boy." Then it was, the witness says, he remarked that he thought the Clancy boy was all right, and when the witness said that, Goodwin said, "He is the God-damn rascal." The witness says he turned and went in the house and in about a minute he heard three shots and heard the deceased cry out: "O Lord, Judge, go get the doctor!" The witness Fralick testified that he went with the deceased to the home of Jake Ross on the night in question,

and went on into the room, and when they got on the porch they saw Goodwin and appellant in what was called a shed room with some negroes, and they were all sitting down; that the deceased and the witness went into the back room of the house to get something to eat, and that there Eggleston approached the deceased and bantered him for a game of cards; that Eggleston left and came back and said he could not find any cards, and the deceased remarked that he was just "stalling;" that while the witness and the deceased were sitting on the bed in the kitchen eating, he, witness, heard five shots fired, and that in four or five minutes thereafter the deceased and the witness left the kitchen and came around the house to the front, not being able to go from the kitchen to the back room on account of a table being across the door; that as they went around the corner of the house the deceased said to witness, "Wait on the porch till I come back." The witness went on the porch and stopped and he looked around to see if he could see Woody, the deceased; that he there saw standing close to the porch appellant, Goodwin and Shorty; that they were leaning against the wall; that they walked around the corner of the house and the witness says he looked again but did not see deceased. He further says he then went into the back room of the house and looked into the kitchen to see if he could see the deceased, when he turned, came back out on the porch and went to the edge of the porch and looked down the wall of the house and saw Goodwin, Shorty, appellant and deceased standing right close together. The first thing the witness said he heard appellant say to the deceased was, "Why did you say you would play if you didn't intend to?" and deceased replied, "I God, or by God, I don't to." Here the witness says he didn't understand just what deceased said. The shooting then occurred, two shots were fired; that appellant did the shooting; that deceased was three or four or five feet from appellant when he was shot. The witness further says: "I saw Woody when the shooting occurred; Woody was doing nothing when appellant killed him, his hands were at his side." Just before Eggleston got the gun he stepped back; he did not sling his hands out, he just stepped back; that he, witness, heard the cocking of the pistol, then Woody stepped back and the gun fired. Witness says, "I heard Woody say, "O Lord, I am shot! Judge, send for the doctor." At the time of the conversation between Eggleston and Woody, Clancy was not close enough to have struck Eggleston with a knife, nor was he close enough to have struck him with anything."

The appellant took the stand and testified that he, in company with Goodwin, went to the negro "festival" on that night; that Clancy, deceased, and some more white fellows with him came after they, he and Goodwin, got there; that he did not know the deceased and had never met him before that night; that he had a conversation with the deceased, and that he, appellant, said to the deceased

that he was the best five up player in Limestone County; that the deceased said that he was not much on five up, but he could play pitch; that the appellant said he was willing to play with him, and that he, appellant, went off to try to find some cards and came back and had a talk with the deceased; that he heard some shooting that night, and that he was on the west side of the house by the side room on the gallery when he heard the shooting, and that he thought the shooting was on the east side of the house, the kitchen being on the east side; and he said that when this shooting occurred Jess Goodwin came to him and asked him if he had a pistol and that he gave Goodwin the pistol, he stating that he wanted to see who it was that was doing the shooting; that when he gave Goodwin the pistol Goodwin went around the house and that he, appellant, sat down on the gallery; that he did not see Clancy any more from the time he loaned Goodwin the pistol until he, appellant, got the pistol back; that after he let Goodwin have the pistol he did not see him for some little time, and that the next time he saw him, Goodwin, he was at the fence talking to a fellow, and that he, Goodwin, called him and handed him back his pistol; that he, appellant, put the pistol in his pocket and went back to the south side of the house, and that he was there talking to a negro named Shorty and asking for some whisky and Goodwin came up and directly, he says, the deceased called him and at the time deceased was standing next to the cook room window on the south side of the house; that he, appellant, was standing right along about even with the window in the main room; that the deceased called him and asked him if he got the cards, when appellant replied no. Deceased said, "Are you going to play me?" Appellant replied, "I could not get the cards to play with." That deceased replied, "You did not mean to play me." He says he replied that he couldn't play, and deceased again repeated, "By God, you didn't mean to play me." That he, appellant, replied: "How in the hell do you know?" that the deceased then said to him, "God-damn you, you don't look bad to me;" and continuing, appellant says, deceased then struck at him and he felt a cut on his arm and he pulled the pistol and shot him; that he shot two or three times; that he went to Jackson's house, made a statement to Jackson about the shooting and then went on home. The appellant emphasized the above statement by saying that these were all the remarks made; that no one else took part in the conversation; that he had no ill-feeling towards Clancy; that no curse words were used by him, and that he did not know that the deceased was mad at him when he called him. He further testified that he had been drinking some during the day and some on that night; that deceased struck at him twice with the knife; that he immediately after the shooting went to Jackson's, told Jackson about it and told him to go back and do something for the deceased. The witness says he was cut on the left arm and his shirt was cut in two places. As to

what became of the negro, Shorty, who seems to have been with the appellant all the time, the record is silent.    Jackson was not placed upon the stand in the trial of the case and neither was Goodwin, but there was an indictment pending against Goodwin for this killing, which, of course,. disqualified him.    We have given this statement of the testimony in the case in order to make clear the conclusions reached by the court as to the issues involved in this case.

1.    The case was submitted to the jury on murder in the first and second degrees, manslaughter and self-defense.    Complaint is made in the motion for new trial and before this court that in submitting the issue of manslaughter to the jury the court did not submit all the law with regard to manslaughter, and in the charge that was given the court omitted some of the elements of manslaughter, and for that reason, together with the failure of the court to give the requested instructions asked by appellant with regard to manslaughter, error prejudicial to the appellant was committed by the trial court.    A most careful review of the testimony in the case demonstrates to our minds that there is no manslaughter in this case. The theory of the State was that the defendant had become incensed at the appearance of the deceased upon the ground and his advice to the negroes to stop playing, and regarded same as an interference with his purposes on that night, and fearing that the deceased might have the parties arrested, he concluded to provoke a difficulty with the deceased, for the purpose of killing him, and the evidence on the part of the State shows a killing without any excuse whatever. While on the part of the defendant, if his story is to be believed, it is a clear case of self-defense.    It seems to be the impression with some members of the bar that in all cases where self-defense arises, that necessarily manslaughter is in the case, but this is not a correct interpretation of the law.    It would be wrong for the court to submit an issue not raised by the testimony, and as manslaughter could not, from any possible view of the facts, as detailed in the trial of this case, be suggested, we think manslaughter is not in the case.    Therefore, if manslaughter is not in the case, any errors of the trial court in its charge on this subject could not avail the appellant, as said charge in submitting this issue was favorable to the appellant and would give the jury an opportunity to find the appellant guilty of a lower grade of homicide than murder in the second degree.    Therefore, it becomes unnecessary for this court to decide that the charge as given was not applicable to the case and the court ought to have given the charge requested by the appellant upon the subject.    We would say, however, in passing, that we think that the charge as given by the court is not subject to the criticisms leveled against it by appellant, and that if the issue of manslaughter was in the case the charge as given by the court was correct, and that the failure of the court to give the charge requested would not be such error as would justify a reversal.

2.   Appellant in his motion for new trial complains of the follow-
ing language in the 10th paragraph of the charge of the court:
"Malice is also a necessary ingredient to the offense of murder in the
second degree.   The distinguishing feature, so far as the element
of malice is concerned, is that in murder of the first degree malice
must be proven to your satisfaction beyond a reasonable doubt as an
existing fact, while in murder of the second degree malice will be
implied from the fact of an unlawful killing."   The latter part of
that paragraph is complained of as error, and if it stood alone it
might be subject to the criticism of counsel, but it is immediately
followed by paragraph 11, in which the court defines to the jury
implied malice as being "that which the law infers from, or imputes
to certain acts, however suddenly done.   Thus when the fact of an
unlawful killing is established, and the facts do not establish malice
beyond a reasonable doubt, nor tends to mitigate, excuse or justify
the act, then the law implies malice and the murder is murder of the
second degree," etc.   And this is followed by paragraph 14, in which
the court makes the application of the law to the facts of the case
and tells them that if the killing is unlawful and done with implied
malice aforethought, it would be murder in the second degree.   It
would be unfair to the trial court if one single sentence. or expres-
sion could be seized upon and detached from the charge as a whole
and criticised as being incorrect.   The charge must be taken as a
whole, and not a word or a sentence here and there seized upon as
a pretext for the reversal of a case.   In the motion for new trial
counsel has singled out expressions here and there in the charge and
asked that the case be reversed, but when these different expressions
are taken in connection with the context they are not grounds for
reversal by this court, and can not be of such a character as would
authorize a reversal, and if errors, in view of the whole case, would
be absolutely harmless.

3.   It is also contended that in charging the law of self-defense
the court required the jury to believe that he acted in self-defense
at the time he shot and killed, and if they so believed they would
acquit the defendant.   Now, in paragraph 21 of the court's charge,
in charging on self-defense the court stated that appellant would be
justified by law if he killed the party, if the party at the time was
making an unlawful and violent attack upon him in a manner
which produced a reasonable expectation of death or fear of some
serious bodily injury, and that a reasonable apprehension or fear of
death or some serious bodily injury would excuse a party in using
all necessary force to protect his life or person, and that there was
no necessity of it being actual danger, provided he acted upon a
reasonable apprehension of danger as it appeared to him, nor was
it necessary for appellant to retreat in order to avoid the necessity
of killing his assailant; and the court further says: "If from the
evidence you believe that defendant, E. L. Eggleston, killed Woody

Clancy, but further believe at the time of so doing Woody Clancy had made an attack on him, which, from the manner and character of it, and considering the instrument used, caused Eggleston to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant Eggleston killed Woody Clancy, then you will acquit the defendant." It will be seen that this charge was followed in paragraphs 23 and 24 by the doctrine of reasonable doubt and the presumption of innocence, and that the reasonable doubt was to be applied to the different degrees after defining the different degrees and applying reasonable doubt to the different degrees, they were then told if they had a reasonable doubt of the guilt of defendant they would acquit him. The complaint of the charge was that the court should have told the jury that if they believed defendant shot in self-defense or had a reasonable doubt thereof, they would acquit. Had the court omitted in his general charge to have submitted the doctrine of reasonable doubt there would have been some force in appellant's contention, but the court told the jury that if they had a reasonable doubt of defendant's guilt they would acquit, and if they believed that what he did he did in self-defense, they would acquit. It is not necessary for the trial court in submitting the different issues raised by the testimony to couple on to his charge the question of reasonable doubt on every issue. An inspection of the charge will show that the court in this case applied the doctrine of reasonable doubt to the guilt of the defendant as well as to both the degrees of culpable homicide of which appellant could be convicted under the charge of the court. This ground of the motion is without merit.

4. After the court had given his general charge to the jury the defendant asked several special charges. These charges were with reference to the testimony as to statements made by Jackson and Goodwin after Woody Clancy had been killed, and that the jury should not consider such acts and declarations; and his third requested charge was that requesting the jury that they would not consider the remarks of counsel criticising the defendant for not offering the shirt in evidence. We think that all the special charges requested by appellant were properly refused.

5. Bill of exceptions No. 13 is a complaint that the court refused to give defendant's requested instruction to the jury that they should not consider the remarks of counsel with regard to the defendant not introducing the shirt in evidence. In the trial of the case when the defendant was on the witness stand he testified that at the time he killed Clancy, Clancy was cutting at him with a knife and that he split the arm sleeve of his shirt open and cut him, and that the arm of the shirt showed where the knife had cut and that there was blood on the shirt. Appellant stated that he had this shirt, and that the same was in the possession of his wife down at the hotel. The

appellant omitted to introduce this shirt in testimony.  The appellant was relying on self-defense, claiming that he had the shirt in possession; that it bore the marks of the assault that had been made upon him and he failed to offer the shirt in evidence.  The State's counsel was justified in commenting on this failure of appellant to introduce said shirt and the State's counsel had the further right to comment on the fact that the defendant's wife had the shirt in possession and refused to produce it.  This was a legitimate line of argument and the State had the right to criticise this failure on the part of appellant.

6.  Bill of exceptions No. 18 is to the action of the court in allowing the witnesses Joe Holley and Alex Ross to testify that at the time they went out to the body with Jackson and Goodwin they were told to go in the house by Goodwin, and that Cripple Alex was in the window and Goodwin told him to take his head in and let the window down, and Alex took his head in and let said window down.  This testimony was objected to for the reason that said acts of Jackson and Goodwin were done after the killing and in the absence of the defendant and were not admissible against him and were calculated to and did produce prejudice in the minds of the jury against defendant; and it was irrelevant and immaterial and did not tend to prove any issue in the case.  The court overruled the objections and permitted the witnesses to testify as above stated.  In his qualification to the bill the trial judge says that he permitted this testimony as a part of the res gestae on the theory of the State that the defendant Eggleston and the witness Goodwin acted together in the commission of the offense and that Jess Goodwin and Jackson, immediately after the killing and after the three had met and talked together at the house of Jackson, returned to the scene of the killing and run all the negroes away from the body of the deceased, and their purpose in so doing was to conceal the offense that was committed by surrounding the body and placing by the side of the body a knife in order to prove that defendant shot in self-defense.  The first parties that got to the body of the deceased, which was but a moment after the killing, state that deceased was lying flat on his back with his hands back on the ground thrown above his head, his hands open and the backs downward; that he was lying right by the wall of the house, the south side of the house, straight up and down with the side of the house.  Right under the house and close to his body there were some jugs.  The first witnesses who got to the scene saw no knife around the body.  In two or three minutes Jackson, who lived only 150 yards from the scene of the killing, together with Goodwin, one of the parties charged with being in the killing, returns to the scene of the killing; they move the jug away from close to his hand; they directed the negroes around to go away —go in the house, shut down the window and stay there, and then when the officers come they direct their attention to the fact that

there is a knife there. Several witnesses who were introduced, intimate with the deceased, swore positively that the knife was not his knife, and that he did not own a knife. Appellant offered some testimony that this was deceased's knife. The theory of the State was that Goodwin and Jackson placed this knife by the body of deceased for the purpose of proving the defendant shot in self-defense. Now then, the question presented to us is this: Were the acts and declarations of Goodwin and Jackson, after the killing, in the absence of the appellant, admissible? That their acts were admissible there is no doubt. Now, were the declarations admissible? If a conspiracy had been entered into by Goodwin and appellant to kill the deceased, then if the declarations of a co-conspirator would not be admissible as res gestae, it could not be offered as testimony against his co-conspirator after the dissolution of the partnership or accomplishment of the purpose for which the conspiracy had been entered into. But if it was part of the conspiracy, after the killing, that the co-conspirator should return to the body and place a knife there so as to show that the appellant committed no crime, and what he did was in self-defense, it would be in the nature of concealing the crime that had been committed, and the act of a co-conspirator under such circumstances would be admissible. Whenever the statements of a third person are so closely connected with the crime as to constitute part of the res gestae they are always admissible. Acts or declarations of conspirators are not always excluded because they were done or made after the commission of the crime. If for any reason, as for escape or concealment, the common purpose continues, declarations in furtherance thereof are admissible, although the crime which was the object of the conspiracy has been consummated. See 12 Cyc., p. 438. Where the conspiracy has for its purpose not only the commission of a crime, but also a division of the profits or the realization of the benefits which are to result therefrom, as in conspiracy to commit larceny or embezzlement, the declarations by one conspirator made after the crime but before the subsequent arrangements are complete, are competent as against his co-conspirators. See Franks v. State, 36 Texas Crim. Rep., 149; O'Neal v. State, 14 Texas Crim. App., 582. Acts done and declarations made by one conspirator after the commission of a crime are admissible against his co-conspirators where they are so connected with the crime as to constitute a part of the res gestae. See Pace v. State, 20 S. W., 762; Phelps v. State, 15 Texas Crim. App., 45. In the case of Weathersby v. State, 29 Texas Crim. App., 278, one of the injured parties, W. H. Pope, remarked to one Keller, who was jointly indicted with Weathersby, that he, Keller, had murdered Major Turner and Alex Pope and shot him, W. H. Pope, all to pieces and brought in his ruffian brother-in-law to do said murder. This was objected to because made by Keller when under arrest and in the absence of Weathersby, when he was on trial. This court held

that this testimony was clearly admissible, the statement being that it was a matter so closely connected with the shooting that it constituted a part of the transaction and was clearly admissible as part of the res gestae, citing Thompson v. State, 19 Texas Crim. App., 593; Kennedy v. The State, 19 Texas Crim. App., 618; Powers v. State, 23 Texas Crim. App., 42. Wherever the declaration or the statement of a co-conspirator, though committed shortly after and intimately connected with the main transaction, the same is always admissible as a part of the res gestae. The declaration becomes an overt act connected with and explanatory to some thing connected with the transaction. Here, the appellant, as soon as he fired the fatal shot, left and went hurriedly to Jackson's house, instructed him to go to the body of the deceased, Jackson, in company with the co-conspirator Goodwin, reaches the body but a minute or two after the killing, removes the jug away from the body, tells the parties who are present to leave and get out of the way, stays and watches the body until the officers come and immediately points to an open knife lying by the body. All of these matters transpired within a minute or two after the killing and so intimately connected with the main transaction as to make the declaration an overt act and admissible against the defendant. In the case of Clark v. State, 28 Texas Crim. App., 189, the court says: "Any fact or circumstance which would tend to prove the guilt of the codefendant would also tend to prove the guilt of the defendant, and would be admissible against him." See also Franks v. State, 36 Texas Crim. Rep., 149. In the case of Long v. State, 55 Texas Crim. Rep., 55, this court says: "It is true if we look at the statement of facts and may be from the bills of exceptions, that appellant was not immediately present but he was nearby, and under the facts detailed by the witnesses, was so connected with the theft that it was a part of the immediate transaction. We are of opinion that the facts in this case do not bring appellant's exceptions within the rule that they are statements of a co-conspirator made after the termination of the conspiracy." In the case of Gracy v. State, 57 Texas Crim. Rep., 68, 121 S. W., 705, this court says: "But it is as equally well settled that the acts and declarations of one conspirator are admissible against another conspirator pending the conspiracy and until its final determination. As long as the conspiracy is pending or the common purpose and design is not completed all the acts and declarations of a co-conspirator are admissible." It may be stated as a general rule that the declarations of a co-conspirator in furtherance of a common design are always admissible as long as the conspiracy continues, though made in the absence of the co-conspirator." In the case of Clark v. State, 28 Texas Crim. App., 189, and in the case of Gregg v. State, 12 S. W., 732, this court held that while declarations and acts of one conspirator made after the commission of the crime are excluded as against a co-conspirator, evidence of

the finding of the fruits of the crime in the possession of one of the conspirators or evidence that accused, when arrested, had in his possession property proved to have been in the possession of an accomplice or co-conspirator at the time, is competent. Pierson v. State, 18 Texas Cr. App., 524. In the case of Dobbs v. State, 54 Texas Crim. Rep., 579, 113 S. W., 923, it was held that the fruits of a conspiracy could be shown even after the conspiracy had been ended. We are of opinion that this proof was admissible as part of the res gestae and as declarations of a co-conspirator in furtherance of and carrying out the design to commit the crime and to cover up the commission of the crime by placing by the body an open knife to show that the act of killing was done in self-defense. For these reasons we hold that the court did not err in permitting the testimony to be introduced upon the trial of the case.

7. These are the only questions we deem necessary to consider in passing upon the case. The other objections raised by the appellant are without merit. We think the appellant has had a fair and impartial trial; that the verdict of the jury was amply supported by the testimony, and finding no errors in the record of such a character as to require a reversal, the judgment of the lower court is in all things affirmed.

*Affirmed.*

### ON REHEARING.

#### June 8, 1910.

McCORD, JUDGE.—This case was affirmed at a former day of this term and appellant has filed a motion for rehearing in which the contention is made that this court was in error in holding that manslaughter was not in the case. We have carefully gone over the facts' and adhere to our former opinion that there was no manslaughter in this case, and that whatever errors, if any, the court below may have committed in its charge upon manslaughter were harmless.

Counsel insist in their motion also that error prejudicial to the defendant was committed by the trial court in the 19th paragraph of the charge, which is as follows: "Though you may believe that the killing, if any, took place under circumstances showing no deliberation, yet if the defendant, A. L. Eggleston, provoked the difficulty with the apparent intention of killing or doing serious bodily injury to Woody Clancy, the offense does not come within the definition of manslaughter." Now, this paragraph of the charge was given in connection with the charge of the court in its definition of manslaughter, and was preceded by paragraph 18, which defined adequate cause and then was followed by paragraph 20, making the application of the law to the facts of the case in which the court directed the jury that if the killing was done in a sudden transport of passion, aroused by adequate cause and not done in defense of himself that this would be manslaughter. The place that this charge complained

of occupies in the charge of the court, while erroneous, was perfectly
harmless. It is true, there was no provoking the difficulty in the
case, but evidently the.court was giving this more in the nature of
an illustration in attempting to draw the distinction between murder
and manslaughter. Had this charge been given in connection with
self-defense we would have held it erroneous, but in its connection in
this case we are of opinion that it was perfectly harmless in view
of the fact that we hold that there was no manslaughter in the case.
This point was not passed upon in the original opinion, and out of
deference to appellant's insistence on this question in his motion for
rehearing we make these observations.

Appellant in his motion for rehearing insists that this court was
in error in holding that the court below correctly admitted the tes-
timony of the conduct of Goodwin and Jackson when they came up
to the body of the deceased; that they removed a jug which was
close to the body and that they ordered all the parties around the
body to leave and ordered some negroes who were looking out at the
window to take their heads in and close the window, the contention
being that the acts and declarations of parties having no connection
with the commission of the offense are never admissible against a
defendant. In our original opinion we held this testimony admis-
sible as res gestae. We further hold that this testimony was admis-
sible as original. testimony. If the State had offered a witness who
would testify that he saw parties go up to the dead body and place
an open knife down by the body, would not this testimony be admis-
sible to contradict the contention of the appellant that an open knife
was found by the dead body? A party indicted for murder, in sup-
port of his theory of self-defense, offers proof that an open knife is
found by the body. To contradict this, would not the State have a
right to show that after the man was killed and the appellant had
left, that other parties came and put the open knife by the side of
the body? We think unquestionably this testimony would be admis-
sible. In this case two witnesses had testified that before Jackson
and Goodwin came to the body they viewed it and saw no open
knife. Jackson and Goodwin approach, require the parties present
at the body to absent themselves; they are seen to move a jug away
from the body, and when other parties come up subsequently they
point to an open knife lying by the body. Then if the State can
prove that a third party put the knife there after the killing, this
would be original testimony, and if it can be proved directly, can
it not be proved circumstantially? Unquestionably so. A party
takes the stand and testified that he was present at the killing and
that he saw the deceased draw a knife and attempt to stab the party
who did the killing. Would not the State have the right to prove
that this witness was not present at the killing? Would he not have
the right to prove that the witness who proposed to make the proof
had manufactured his testimony, and that they were present and

heard the agreement to testify in self-defense to show that his state-ment of the matter was false? This would be admissible testimony. Then why would not the testimony in this case be admissible as showing that some parties other than the defendant placed the knife by the body of the deceased in order to strengthen the theory of the defense? Would not the State have the right to show that this was false? The testimony was admissible as original testimony to con-tradict and impeach the theory of the defendant.

As to the other points suggested in the motion, we are of opinion that they are without merit, and we find nothing to change our orig-inal opinion in this case. The motion will therefore be overruled, and it is accordingly so ordered.

*Overruled.*