### PETER BLUE v. THE STATE.

No. 1646. Decided June 5, 1912.

Rehearing denied June 26, 1912.

**1.—Murder—Charge of Court—Manslaughter.**

Where, upon trial of murder the evidence did not raise the issue of manslaughter, there was no error in the court's failure to charge thereon.

**2.—Same—Case Stated—Manslaughter not Raised by Evidence.**

Where, upon trial of murder, the evidence showed premeditation on part of defendant to kill the deceased, and that he killed him without provocation, and defendant pleaded self-defense, there was no error in the court's failure to submit a charge on manslaughter.

**3.—Same—Rule Stated.**

It is now elementary in this State that if a case is either murder or perfect self-defense, it is not error to fail to charge on manslaughter. Following Alexander v. State, 63 Texas Crim. Rep., 102, and other cases.

**4.—Same—Evidence—Discretion of Court.**

Where, upon trial of murder, the witness having already testified that a certain party had no gun, there was no error in sustaining the State's objection to a repetition of this matter.

**5.—Same—Evidence—Res Gestae.**

Upon trial of murder, there was no error in sustaining an objection to testimony as to what defendant told the justice of the peace, some time after the killing, as this was not res gestae.

**6.—Same—Evidence—Declaration of Third Parties.**

Upon trial of murder, there was no error in sustaining objections to certain testimony as to the declaration of a child after the killing to the effect that some one shot at defendant.

**7.—Same—Charge of Court—Self-Defense.**

Where, upon trial of murder, the court submitted the proper charge on self-defense, there was no error.

**8.—Same—General Objections.**

Where the objections to the court's charge were of a general character, the same could not be considered on appeal. Following Berg v. State, 64 Texas Crim. Rep., 612.

**9.—Same—Sufficiency of the Evidence—Charge of Court.**

Where, upon trial of murder, the defendant was convicted of murder in the second degree, and the court properly submitted the law of the case as applicable to the facts which sustained the conviction, there was no error.

Appeal from the District Court of Chambers. Tried below before the Hon. L. B. Hightower.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*Harbert Davenport, E. B. Pickett, Jr.,* and *Stevens & Stevens,* for appellant.—On the question of the court's failure to charge on deadly weapon and presumption of intent of deceased to kill: Hall v. State, 43 Texas Crim. Rep., 484; McMichael v. State, 49 id., 425; Ward v. State, 30 Texas Crim. App., 688; Scott v. State, 81 S. W. Rep., 950.

*C. E. Lane,* Assistant Attorney-General, for the State.—Cited cases in opinion.

PRENDERGAST, JUDGE.—Appellant was convicted of murder in the second degree, charged to have been committed May 28, 1910, on

George Banks, also called "Mount" Banks, and his punishment fixed at twenty-five years in the penitentiary.

The testimony shows that about two weeks before the killing, at a festival, or party, the appellant and several others were out in the road some fifty yards from the house where the party was going on, when another rode up and appellant said: "Boys, there is no use you boys coming here tonight, your girl won't be here, you won't get no 'booty' tonight." Some other in the crowd asked "Who." Appellant replied, "Inez." Inez was deceased's sister. Deceased, who heard this took it as insulting remarks about his sister, and resented it, telling appellant not to talk about his sister in that way. Appellant replied, "By God, I didn't say no harm about her." Appellant says deceased said, "You can cut that out, you can drop her name right now. There is lots of those fellows anyhow talking about my sister." Appellant claims he further then said to the deceased that he, appellant, had sisters and he didn't talk about "no man's sisters." Appellant further testified that deceased then said, "There is lots of these fellows around here talking about these women as if they were cows." The witnesses differ as to the exact expression of what was said between the parties at the time, but they all agree that when appellant first made the remarks about deceased's sister, deceased resented it and words followed; that deceased then walked off, got his gun, came back to where the crowd was, threw it down on the crowd, told them to scatter, and then, as they got up, threw his hat out on the ground and invited any of them to step in it. One of the crowd then picked up the hat, put it on deceased's head and told him that what had occurred ought not to cause any trouble, and they all thereupon dispersed. Appellant immediately started off walking, from the crowd towards his home. Some of the witnesses testified that as appellant was leaving he said he would fix him (deceased) when he came back. All the testimony, including that of appellant, shows that he then left for his home, he himself, testifying that as soon as he got out of sight he ran to his home for his gun, a repeating Winchester. Several witnesses testified after being gone fifteen or twenty minutes, appellant returned to the party, hunted for and tried to find deceased. Deceased in the meantime had gone off to his home and did not return. When appellant returned with his gun, some of the witnesses testified, he not only had his Winchester, but several cartridges for it, and said: "I will plant every one of these balls in him (deceased); the damn son-of-a-bitch, I will put every one of these in him." Appellant, himself, on this point, denied making such threat, but said he was not caring if he saw deceased; "I was not going to settle it with him, but if it had to be settled with him right there, I expect it would come off." No other explanation was made by him as to why he went off, got his Winchester and came back at that time. All this occurred on one Saturday night. The killing occurred on Friday about noon, lacking one day of being two weeks from that time.

The uncontroverted testimony further shows that the deceased lived with his wife at her father, Moscow Cooper's, and that the appellant knew this. That repeatedly after the Saturday night row, almost from day to day, the appellant passed back and forth in a path or road leading right by deceased's home, the State's witness testifying that every time he did so, he was carrying his Winchester rifle, and held it with one hand across the other arm. Appellant himself admits all this, except, he claims, that he went twice on horseback when he did not have his gun with him, but he knew deceased was not then there. The deceased was not shown to carry his gun any of this time, but appellant himself testified that he *heard* that on Sunday evening, after the trouble at the party about deceased's sister the night before, deceased had his gun going to his work and passed the grounds where a baseball game was going on. Appellant is not shown to have been at the game and said he did not see deceased with the gun at that time, and did not claim he saw him with a gun at any other time.

Appellant had two witnesses who testified that the general reputation of deceased was that of a violent and dangerous man. The State controverted this and had some testimony to the reverse.

Moscow Cooper, the father-in-law of deceased with whom deceased and his wife lived, testified that a few days—about Wednesday—after the night of the trouble about deceased's sister at said festival, when appellant was passing his house, he had a conversation with the appellant in which appellant told him that "he was going to kill deceased; that when he and deceased met one or the other was going to flutter in Egypt; one or the other had to leave; that he was going to put him on the other side of Turtle Bay to stay." Appellant did not deny, as stated above, repeatedly going by Moscow Cooper's place with his Winchester rifle between the time of the trouble about deceased's sister and the killing, and did not deny having at said time a conversation with Moscow Cooper. He did not testify what the conversation was, or what either said, but did deny making such threat.

Some four or five eyewitnesses for the State testified that about noon on Friday, appellant was passing Moscow Cooper's house carrying with him at the time his Winchester rifle; that deceased was on the gallery at his father-in-law's, which was his home, and saw, or someone called his attention to the fact, that appellant was passing. These eyewitnesses differ as to the details of what was said between deceased and the appellant at that time, some of them claiming that deceased first called to appellant. Another that appellant called to deceased and said, "Mount, come out here, I want to talk with you." Deceased replied, "Well, Peter, I heard you told Uncle Moscow you was going to kill me." Some of the others stating that deceased said, "I heard you told Uncle Moscow when we met one of us had to flutter in Egypt." At any rate, it was shown that either at the invitation of the appellant or voluntarily, deceased then walked out in the yard gate

with his gun, and in the colloquy between them, appellant said to deceased that if the difficulty was to be settled between them he didn't want it settled on somebody else's place or premises, and invited him out to settle it. Deceased then went outside of the yard several steps. That in the colloquy then occurring between them, all the witnesses testified, deceased had the butt of his gun standing on the ground with his hand up over the barrel, in no attitude whatever to shoot; appellant did not dispute this; that when the deceased was doing nothing at the time, appellant said, "Matters a God damn," and threw his gun down on deceased and shot him twice. That when the first shot was fired deceased began to stagger, staggering backwards several steps, and just before falling his gun fired off into the ground. From the testimony, we think, this firing by deceased was without aim at appellant and caused more by deceased staggering than otherwise. All of the State's witnesses testified that it was after appellant had shot twice. Appellant claims that he shot only once and did not shoot until deceased shot; and that immediately after deceased shot, he shot only one time at deceased, and that Clyde Cooper, a brother-in-law of deceased, who had passed out of the yard gate some twenty steps somewhat back of him, going to hunt a horse, fired the third shot. All of the eyewitnesses and Clyde Cooper, testify that Clyde did not shoot at any time. They all agree that after the three shots, appellant went to Moscow Cooper's barn. He himself testified that he then extracted the empty shell from his gun with his knife and put it in his pocket; that he then left the barn, walked up to where the deceased was lying, and one of the State's witnesses testified, patted the deceased on the head while he was lying there on the ground dying, and said, "Oh! lie still, old bully; by God, lie still, I have got you." Another witness testified substantially the same thing; and still another, on this point, testified: "And he (appellant) came up from the barn to where I was at Mount. I says, 'Peter, what in the name of God, you come here and shoot that man down for, kill that man?' He says, 'It had to be done.' I says, 'Well, Peter, I have always talked to you.' And he says, 'Yes, Uncle Sanders, you have always talked to me, but it had to be done,' and he (appellant) reached down and patted him (deceased) on the head. I says, 'Peter, I am sorry for you.' When he (appellant) patted him (deceased) on the head he says, 'Old bully, lie there, I have got you,' I says, 'Yes, and they are going to get you just that very way.' He says, 'I will have to abide by the consequences; well, I says, 'It will be poor dividement, Peter,' and he said, 'I don't give a damn what they do with me.'" Appellant did not deny doing or saying what either of these witnesses testified he did and said. That the appellant then went on some distance with this witness and when the witness reached his, witness' home, he stopped and appellant went on. Appellant testified that he went to his home, put up his gun in the rack, told his father about the killing and then walked off a mile or more to the justice of the peace.

We will give the appellant's testimony of the killing and what he says occurred immediately before and immediately thereafter just as he testified to it: "On the day of the killing when I came along the road there by Moscow Cooper's house I saw Mount there. Mount was sitting on the gallery. At that time I was going to old man Isom Richardson's, he is my uncle. With reference to how far beyond Moscow's to old man Isom's fence—there is a fenced place and old man Isom lives in that and old man Moscow lived in his, right across where you go over to go through Isom's field. The road that I was on lead to Isom's house. About the time I got up about opposite Moscow's house this Mount Bank's wife, Bertha, she says to Mount, "Now is your time, here he comes past Bully' (Bertha denied saying any such thing) and when she says that to him—he was sitting on the gallery with his legs crossed this way—I am going to tell the truth. I have got to tell that here today and I may have to tell it some day in judgment day—he was sitting on the gallery with his gun this way; he says to me, 'Peter Blue, I heard that you said you was going to kill me.' I says, 'No, Mount, I never said I was going to kill you.' He said, 'Old man Moscow says you told him you was going to kill me.' So then Mount gets up and comes out to where I was. After he got out to where I was I says, 'Mount, that little fuss that occurred over there between me and you don't amount to all that.' He says, 'Well,' he says, 'now is just as good a time to settle it as any other time,' and after he said that, why, I told him, I says, 'Mount, if you are going to get mad about it I wouldn't mean to settle it here; this is at some other man's premises, place, and asked him to come on and settle it some other time and about that time he shot; when Mount shot—I never seen him—I didn't know he cocked his gun to shoot, he could not have got a chance to do that because if I knowed that he came out with the intention of killing me or anything like that I could have shot him, but Mount Banks throws his gun up—b-o-o-m and I shot. When I shot he wheeled and fell and when he fell this little fellow Clyde he came on out with Mount, he was back about south— he was southwest of where me and Mount was and he lets loose, he makes a shot. That was in the back, around towards the back of me. He was about twenty or twenty-two steps from me, about that far, it might not have been so many, I never stepped it off to see, and so when Clyde makes that shot I turns and goes on to the barn. When I gets there I takes my knife out to pull the shell out of the gun and the shell I pulled out I put it in my pocket. When I passed by there about that time old man Sanders Cooper was there and he says, 'Peter, what made you do that?' I said, 'Uncle Sanders, I could not help myself. I did that to save myself.' When I said that to him he turned and got hold of me and said come on and took me and went on down the road, and after we started away from where this fellow was killed I got about eight or ten steps from him this Fred Cooper— he did not come out the door, when he got to the door he says, 'Look

out Uncle Sanders, look out, let me get to him.' When he said that
Uncle Sanders said, 'Don't you shoot this way, Fred, don't you shoot
this way,' and I told him you had better stop him because if you don't
something might happen again. That is what I told him; after we
got there he turned off to his house and I went on home. Fred had
a pistol in his hand and he was waiving it that way (indicating) try-
ing to get Uncle Sanders to move. Uncle Sanders said, 'Fred, don't
you shoot this way,' and waived his hands° like that. He had me
going with his hand pressed on my shoulder and when we got opposite
his house he turned off into his house and I goes on home. When
I gets home I tells my father about what happened. I then goes right
straight on up to Mr. Wilson's and gives myself up."

Appellant, in his brief, presents but one question, and that is, he
claims that the court erred in not charging on manslaughter. We
have carefully and repeatedly gone over and studied the evidence in
this case and in our opinion the court should not have charged on
manslaughter as it is in no way raised by the evidence.

The evidence not only does not show sudden passion or adequate
cause, but on the contrary, the evidence repels both of these elements
of manslaughter. All the evidence is "of a most cogent character and
force, showing malice." Miller v. State, 31 Texas Crim. Rep., 639;
Massie v. State, 30 Texas Crim. App., 64; Ex parte Jones, 31 Texas
Crim. Rep., 422; Ex parte Sherwood, 29 Texas Crim. App., 334; Mil-
ler v. State, 20 S. W. Rep., 1103. In our opinion the evidence shows
a premeditation and coolness on the part of appellant and a prepara-
tion to kill, and, while not lying in wait, he repeatedly and often
went by the home of deceased, where he knew deceased stayed, prepared
and with the full determination of killing him if he had ·an oppor-
tunity. In other words, that he sought the opportunity repeatedly for
two weeks to find the deceased for the purpose of killing him. That
when he finally did come upon him he killed him without the slight-
est provocation, or the slightest demonstration on the part of the
deceased towards him. Appellant's evidence alone, even from his
standpoint, only raises self-defense. The physical facts and the
testimony of some four or five eyewitnesses disputed him directly
and pointedly on this question, and the jury found against him.

It is now elementary in this State that if a case is either murder
or perfect self-defense, it is not error to fail to charge on man-
slaughter. Williams v. State, 2 Texas Crim. App., 287; Grissom v.
State, 4 Texas Crim. App., 387; Homberg v. State, 12 Texas Crim.
App., 1; Self v. State, 28 Texas Crim. App., 409, 13 S. W. Rep., 602;
Angus v. State, 29 Texas Crim. App., 62, 14 S. W. Rep., 443; Floyd
v. State, 29 Texas Crim. App., 355, 16 S. W. Rep., 188; McGrath v.
State, 35 Texas Crim. Rep., 413, 34 S. W. Rep., 127, 941; Lentz v.
State, 48 Texas Crim. Rep., 2, 85 S. W. Rep., 1068; Jirou v. State,
53 Texas Crim. Rep., 18, 108 S. W. Rep., 655; Shelton v. State, 54
Texas Crim. Rep., 590, 114 S. W. Rep., 122; Ward v. State, 59 Texas

Crim. Rep., 62, 126 S. W. Rep., 1146; Canon v. State, 59 Texas Crim. Rep., 398, 128 S. W. Rep., 146; Dougherty v. State, 59 Texas Crim. Rep., 464, 128 S. W. Rep., 401; Jennings v. State, 60 Texas Crim. Rep., 421, 132 S. W., 473; Hardcastle v. State, 36 Texas Crim. Rep., 562, 38 S. W., 186; Eggleston v. State, 59 Texas Crim. Rep., 542, 128 S. W. Rep., 1105; Alexander v. State, 63 Texas Crim. Rep., 102, 138 S. W. Rep., 722.

We are clearly of the opinion that the evidence in this case in no way raised the issue of manslaughter so as to require a charge thereon by the court. Jennings v. State, 60 Texas Crim. Rep., 421; Blount v. State, 58 Texas Crim. Rep., 510; Dougherty v. State, 59 Texas Crim. Rep., 464; Potts v. State, 56 Texas Crim. Rep., 44; Ford v. State, 40 Texas Crim. Rep., 280; Treadway v. State, 65 Texas Crim. Rep., 208, 144 S. W., 655, and cases therein cited.

Clyde Cooper and some two others of the State's witnesses testified that Clyde had a single-barrel shotgun carrying it with him at the time of the killing and that about the time the deceased passed out of the yard gate to appellant, that Clyde also passed out and went on off with his gun, hunting for or to get a horse to go somewhere on an errand. When Fred Cooper was on the stand, as a State's witness, he testified positively that Clyde did not have a gun when the shooting occurred and that he did not go down the road at the time with a gun, but that he was standing at the gate and did not leave the gate, nor go down the road to get a horse and that he was positive of that. Thereupon the appellant, on cross-examination, asked him: "Are you as positive of that as you are of anything else you testified to?" And then asked this question: "Are you as positive of the fact that Clyde did not go down the road with a gun about the time of that trouble as you are of the fact that Peter Blue shot George Banks?" To which questions the State objected and the court sustained the objections. The witness, if permitted to have testified, would have stated that he was as positive that Clyde Cooper did not have a gun when the shooting occurred as he was that Peter Blue shot at George Banks. The witness, as shown, having testified what he did and that he was positive of that fact, the court did not err in not permitting the character of cross-examination shown above. Such matters are largely in the discretion of the trial court and the witness having already so testified and testified positively, it certainly showed no error not to have had him to repeat in substance the same answers to the two questions objected to.

Appellant has two other bills of exceptions. They show in substance that after the killing the appellant walked away from the scene, walked several hundred yards to his home, put up his gun, told his father of the killing and then walked a mile to the home of the justice of the peace and gave himself up. He then offered to prove, as res gestae, by himself and by the justice of the peace, what he then told the justice of the peace of the killing. Upon objections of the State

this evidence was not permitted. We think it clear that this evidence was not res gestae and the court did not err in excluding it. See section 1236, White's Ann. Penal Code; and section 1085, White's Ann. Code Criminal Procedure.

By another bill appellant complains that the court erred in not permitting him to prove by Moscow Cooper that he heard some child state, after the killing when appellant was not present, that Clyde Cooper shot at appellant. The bill shows that when this evidence was offered that the court at the instance of the parties retired the jury and heard the testimony of the witness on the subject, which was that from a half hour to an hour after the killing when a great many people and children from all the surroundings, had gathered at his house where the killing had occurred, that he heard some child who was not identified, state that Clyde Cooper had shot at appellant. The bill, in our opinion, demonstrates that the evidence was inadmissible for any purpose and the court did not err in so holding. See sections 1242 and 1243, White's Ann. Penal Code; and section 1096, White's Ann. Code Criminal Procedure.

There is no merit in appellant's complaint to a paragraph of the court's charge on self-defense. There being no reversible error the judgment is affirmed.

*Affirmed.*

ON REHEARING.

June 26, 1912.

PRENDERGAST, JUDGE.—The only question raised by appellant on his motion for rehearing is what he claims is raised by the eighth ground of his motion for new trial. We quote that ground in full:

"The court erred in not instructing the jury that the defendant had the right to presume that the deceased was going to attack him with a deadly weapon." This, by all the authorities, is uniformly held too general to require this court to consider it. Ryan v. State, 64 Texas Crim. Rep., 628, 142 S. W. Rep., 878; Berg v. State, 64 Texas Crim. Rep., 612, 142 S. W. Rep., 884, and cases therein cited.

The appellant now claims that the evidence showed that the deceased was advancing toward the defendant with a gun at the time appellant shot and killed him and refers us to page 37 of the statement of facts. In the original opinion, we gave the full substance of the testimony and on this particular page of the statement of facts, we quoted fully and literally the testimony of the appellant in the original opinion. As we read and study this testimony the very reverse of appellant's contention is shown thereby. And, as stated in the original opinion, all of the eyewitnesses, some four or five in number, testified that at the time appellant shot deceased that the deceased had the butt of his gun standing on the ground with his hands up over the barrel in no attitude whatever to shoot. Appellant did not dispute this, and according to the State's witnesses, when the deceased was doing nothing

at the time, appellant said: "Matters a God damn," and threw his gun down on deceased and shot him. So that even if we could consider appellant's assignment above, the evidence did not raise and the court should not have charged as therein claimed by appellant.

The motion for rehearing is overruled.

*Overruled.*