## M. HARDCASTLE v. THE STATE.

*No. 1393.    Decided December 9th, 1896.*

**1. Murder—Manslaughter—Insulting Conduct Toward Female Relative—Charge.**

On a trial for murder, in order to reduce the homicide from murder to manslaughter on account of insulting conduct towards a female relative of the slayer, such killing must occur at the first meeting of the parties after defendant has been informed of the insult; and, where the proof showed, beyond question, that there were two meetings between the parties after defendant was informed of the insult, such insulting conduct could not be considered as adequate cause to reduce the killing to manslaughter, but could only be looked to in determining whether the homicide was committed upon implied or express malice; and it was not error for the court to so instruct the jury.

**2. Same—Coupling Causes, to Make Adequate Cause.**

Insulting conduct towards a female relative, which had ceased to be adequate cause on account of the subsequent meeting of the parties, could not be coupled with other insulting conduct and language, indulged in afterwards by deceased to defendant, so as to constitute adequate cause to reduce the killing to manslaughter, where it appeared that fifteen or twenty minutes elapsed between the last insults and the killing; and especially so, where defendant, in his own testimony as a witness, states that his only purpose in shooting deceased was to save his own life, and that he acted solely in self-defense. And, where the evidence, moreover, shows that at the time of the shooting, he was cool, collected and unmoved by passion. And in such a state of case, the court did not err in refusing to charge on manslaughter.

**3. Murder in the Second Degree—Evidence Sufficient.**

See, opinion for facts stated which the court hold amply sufficient to sustain a judgment for a graver offense than murder in the second degree.

APPEAL from the Criminal District Court of Dallas. Tried below before Hon. CHARLES F. CLINT.

Appeal from a conviction for murder in the second degree; penalty, thirty-five years' imprisonment in the penitentiary.

The indictment charged appellant with the murder of Dr. Joseph J. Wray, by shooting him with a pistol, in Dallas County, on the 21st day of October, 1895.

The case is stated in the opinion.

*Martin W. Littleton* and *Kenneth Foree*, for appellant.—The court erred in failing to charge the jury the law of manslaughter as applied to the facts of this case.

"If it reasonably appeared to the defendant from the acts of the deceased that he, the defendant, was in danger of serious bodily harm or death, and, if he was thereby aroused to terror or resentment by the danger that his mind was incapable of cool reflection, and in that condition he slew the deceased, his offense would not be murder, but manslaughter." If on account of the actions of the deceased taken in connection with his previous threats, the defendant was put in such a state of anger, rage, resentment or terror, as in a person of ordinary temper was sufficient to render the mind incapable of cool reflection, then there was adequate cause for the killing, and it would be no higher degree than manslaughter. Such facts might have been insufficient to satisfy the

jury that defendant acted in self-defense, but amply sufficient to warrant them in finding manslaughter.   Neyland v. State, 13 Tex. Crim. App., 536; Williams v. State, 15 Tex. Crim. App., 617; Penal Code, Art. 535; Maher v. People, 10 Mich., 213.

If in a murder case there be evidence which, however, inconclusively tends to prove facts from which the jury may deduce a finding of manslaughter it is incumbent on the court to give the law of manslaughter in charge to the jury, and it should be given affirmatively, strictly and pertinently to a theory of the case indicated by such evidence.   McLaughlin v. State, 10 Tex. Crim. App., 340; Neyland v. State, 13 Tex. Crim. App., 536; Baltrip v. State, 30 Tex. Crim. App., 545; Williams v. State, 15 Tex. Crim. App., 617; West v. State, 2 Tex. Crim. App., 460; Halbert v. State, 3 Tex. Crim. App., 657; Holden v. State, 1 Tex. Crim. App., 225; Williams v. State, 7 Tex. Crim. App., 396; Hudson's case, 40 Texas, 12; Reed v. State, 9 Tex. Crim. App., 317; Luera v. State, 12 Tex. Crim. App., 257; Macky v. State, 13 Tex. Crim. App., 350; Reynolds v. State, 14 Tex. Crim. App., 435; Powell v. State, 13 Tex. Crim. App., 248; Waddlington v. State, 19 Tex. Crim. App., 266; Miles v. State, 18 Tex. Crim. App., 170; Johnson v. State, 22 Tex. Crim. App., 225; Hobbs v. State, 16 Tex. Crim. App., 523; Howard v. State, 23 Tex. Crim. App., 280; Norman v. State, 26 Tex. Crim. App., 221; Hawthorne v. State, 28 Tex. Crim. App., 212; Cochran v. State, 28 Tex. Crim. App., 432; Richardson v. State, 28 Tex. Crim. App., 216.

From an examination of the authorities above cited, it will be found, first, that it is a grave error upon the part of the trial court to submit to the jury the issue of malice, when the court tells them they must confine their deliberations and decision upon said issue alone to the question as to whether the deceased was guilty of using insulting language and conduct afterwards to the wife of the defendant, when, as a matter of fact, there was no proof or contention on the part of the defendant that the deceased had ever been guilty of using insulting language or conduct to the wife of the defendant, and our court has said that even where the issue of manslaughter has been submitted, if the jury is compelled to confine the question of adequate cause to a single condition and that condition is not shown by the evidence, then the charge is held error because it is too restrictive upon the jury.

2. It will be found upon an examination of this case, that within two days of the time of the homicide the defendant and the deceased were the best of friends.   That the defendant, during the sickness of his wife, to save her from the perils of disease, had called upon the deceased to attend her in such sickness, and had thereby established the most confidential relations between his family and the deceased that can exist in human affairs.   That this relation continued until an estrangement took place between the defendant and his wife, on account of a cause which to him was unknown, that she abandoned him and his home, repaired to San Antonio and procured a divorce.

That she returned to the city of Dallas, communicated with him by note, and when she had procured his presence for the purpose of a personal consultation, she informed him that the deceased was the author of his domestic infelicity, and the cause of the divorce. That two days after the communication of these facts to him by his wife, and on the day of the homicide, and about noon thereof, the defendant met the deceased on Commerce street, in the city of Dallas, and when the deceased offered a friendly salute to the defendant, he undertook to administer to him a sound thrashing, which the deceased avoided by fleeing.

That the defendant went on to his place of business, a gambling house over Branch's saloon, and remained there until the evening of said day, when the deceased came to said place of business, accompanied by his brother, and coming into the retail department of said saloon, his brother remaining in the front, the wholesale department, he applied the most violent epithets to the defendant, and only left the house when compelled by the proprietor thereof, saying that he would wait outside for the damn-son-of-a-bitch to come out. That the defendant, confronted with this condition, and surrounded with these circumstances, went upstairs and armed himself with a pistol belonging to a friend. That he then came down into the retail department of said saloon, and waiting a few minutes until the crowd would disperse, he walked to the front door, whereupon he discovered the brother of the deceased standing in the shadow of an adjoining building, and observed him suspiciously glancing time and again at the defendant. That in a very few moments he discovered the deceased making his way toward him from directly across the street, with his hand about half way in his pocket, and with his eyes set directly on the defendant. That the deceased came directly up in front of the defendant, in front of the sidewalk, proceeded by and in front to where the deceased's brother was standing, whispered a few words to his brother, wheeled about, threw his hand upon his hip pocket and said, "Get down from there, you damn-son-of-a-bitch, and defend yourself," and defendant fired and killed him. This theory is presented on behalf of the defendant himself, and supported by two eye witnesses to the tragedy, and from this testimony we think we had a right to expect that the trial court would submit to the jury a charge which would allow them to pass upon the issue of manslaughter, as it would naturally arise from these facts, and we believe that had this been done that the jury would have concluded that the defendant, aroused and inflamed by the highest and strongest provocation, surrounded and threatened by the most dangerous appearances, acted from a sudden passion arising from an adequate cause, and was therefore guilty of no higher degree than manslaughter, and we therefore ask that the judgment be reversed and the cause be remanded.

*Kearby & Muse* and *Mann Trice*, Assistant Attorney-General, for the State.—The appellant relies upon two propositions for reversal of the conviction, viz: (1) That the court erred in failing to submit to the jury the issue of manslaughter; and (2) Erred in instructing the jury that the issue of manslaughter upon the ground of insulting words and conduct to the wife of the appellant was eliminated from the case; and that if the killing was unlawful that evidence of insulting words and conduct of the deceased towards wife of the appellant can only be considered in determining whether the homicide was upon express or implied malice.

For the State it is submitted that the case presents only the issues of murder and self-defense. Manslaughter upon the theory of insults to or adultery with the wife of the appellant was eliminated from the case, because the killing did not occur at the first meeting, it being undisputed that appellant caned deceased and chased him at a meeting prior to the killing; and the defendant testified that he did not kill the deceased on account of improper relations of deceased with his wife. That he, appellant, was divorced from his wife, and would not have killed deceased on account of his wife after the divorce; that the divorce was obtained by appellant's wife on account of non-support and letters from him charging her with unchastity.

Appellant placed the killing solely on the ground of self-defense.

The evidence relative to illicit relations of deceased and appellant's wife being admitted in evidence and the issue of manslaughter upon that ground eliminated from the case under the facts, such evidence had but one legitimate office in the case, viz: to be considered in determining whether the killing was upon express or implied malice, if it should be found unlawful and not in self-defense, there was no error in the instruction complained of, and if error, it was harmless error, because the killing being found to be unlawful by the jury, the homicide could not be less than murder in the second degree, and the appellant was convicted of this grade of homicide.

Under the record and the contention of the appellant as to the charge complained of, we submit the following: There was no error in the charge instructing the jury that manslaughter upon the theory of insults to female relative was eliminated from the case, and that the evidence in relation thereto, if the killing was unlawful, can only be considered in determining whether the homicide was upon express or implied malice. Utzman's case, 32 Tex. Crim. Rep., 430; Jones' case, 31 Tex. Crim. Rep., 422; Jones' case, 33 Tex. Crim. Rep., 492; Maxwell's case, 31 Tex. Crim. Rep., 119.

There was no error in failing to charge manslaughter upon the theory of imperfect self-defense for that, there was no evidence presenting the issue in the case.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and given thirty-five years in the penitentiary, and pros-

ecutes this appeal. The testimony shows, that the killing occurred on the 21st of October, 1895, on Main Street, in the city of Dallas, in front of Branch's saloon. That the defendant and deceased had been acquainted for some years, and were on friendly terms. Deceased, who was a physician, had been treating the wife of the defendant for some time. Defendant and his wife, on account of some disagreement, separated, and she returned to San Antonio, and procured a divorce from him, which was granted about the 7th of October, 1895. It appears that the wife of defendant, a few days before the homicide, returned to Dallas, and some two days before the killing had an interview with the defendant, in which she informed him that the deceased had debauched her while he was treating her. About noon, or a little thereafter, on the 21st of October (the day of the homicide), defendant and deceased met on Commerce Street, near the Oriental Hotel. Deceased extended his hand, and spoke to defendant, and defendant drew his cane, and assaulted deceased, and struck him several blows. Deceased fled, and defendant pursued him a short distance. At the time, defendant was employed at Branch's saloon, in the gambling house upstairs. Deceased had his office in the same block in which the saloon was situated, and west of the saloon. That about 7 o'clock p. m. defendant was at Branch's saloon, in the act of telephoning to some one, when deceased and his brother walked into said saloon. Deceased walked to the rear end of the establishment, where liquors were retailed, his brother remaining in the front part of the house. While there, and waiting for his drink, the testimony shows that he noticed defendant at the telephone, and remarked, "There is the damned son-of-a-bitch who caned me this morning." Branch, the proprietor, apprehending some trouble, interfered, spoke to the defendant, and told him to turn around; he might get shot in the back; and told deceased that he must not have any difficulty in his house. He then walked out of the saloon with his brother. He testifies that deceased stated "that he would not have any difficulty with him in the store, but he would go outside, and wait until the damned son-of-a-bitch comes out." Defendant testified that at this juncture he heard the deceased apply the epithet, "damned son-of-a-bitch" to him, but did not hear him state that he would go outside, and wait for him to come out. It appears that after the deceased and his brother passed out of the saloon, the brother of deceased, R. R. Wray, remained in front of Bejano's restaurant, which adjoins Branch's saloon on the west, and deceased remarked he would go up the street, and come back in a few minutes, and rejoin his brother. The testimony of the State at this point tends to show that in a few minutes deceased came back to where his brother was, and walked up in front of him, and, facing him, said: "I believe I will go to the office," and pulled out his watch to see what the time was, stating he had an engagement between half past 6 and 7. That as he pulled out his watch and looked at it, he turned his head east, and defendant shot him. The deceased fell out in the street off the edge of the sidewalk. Defendant immediately stepped out, and drew his pistol on R. R. Wray, and said,

"You damned son-of-a-bitch, I will shoot you too," and covered him with his pistol, demanding him to give up his gun. Wray told him he did not have any. He then made him throw up his hands, and presently turned around, and walked into the saloon. It is also shown on the part of the State that defendant, shortly after the deceased and his brother left the saloon, came and stood in the front door of Branch's saloon for some time; that he had a pistol in his right hand, rather under his coat. While he was standing there, some one suggested to him to go along upstairs. Defendant replied, "No, I will wait here for that God damned son-of-a-bitch." The defendant's testimony tended to show that after what had occurred in the saloon, while deceased was getting a drink, defendant went upstairs, and armed himself with a pistol, as he apprehended an attack on him by deceased and his brother; that he came down, and stood in the doorway of the saloon, but did not see the parties, and thought they had gone, but looked down in front of Bejano's, and saw the brother of the deceased standing there. This excited his suspicion, and he did not know where deceased might be, and thought he must be somewhere near. That presently he looked across the street, and saw deceased coming over in his direction. Defendant states, "that just before deceased reached the sidewalk, about ten feet therefrom, he stuck his left hand in his front pants pocket, and held it in that position all the while. He did not have his hand clear down, but, from the size of it, I took it that he had his gun. I did not do anything. I was afraid to move. When I saw this other Wray, I was afraid to move, or make any motion to get away, as I did not know but what I might be murdered. Deceased got on the sidewalk, and walked two or three steps below to his brother and wheels, and comes up abreast between his brother and me, and says: 'There is the damned son-of-a-bitch, get down there, and defend yourself.' And then I drew my gun and fired just as I pulled it out. * * * I shot Dr. Wray because I was afraid he was going to kill me. The reason I was afraid was because of the demonstration he made. The talk he had made around there, and other demonstrations he made, showed that he intended to do something. He made demonstrations enough to make me think he was going to kill me. He says: 'There is the damned son-of-a-bitch now; get down and defend yourself;' and he throws his right hand to his hip pocket, his left hand being in his front pants pocket. He put it in his pants pocket just before he got to the outside car track from me, crossing Main street, coming over from the Metropolitan restaurant, and he never removed that hand from his pocket; and when he made this break for his right-hand hip pocket, I thought I was going to get shot, from the demonstration he made, and I drew my pistol and shot." And defendant further testified: "I did not kill Dr. Wray because of his improper relations with my wife. I would not have killed him on that account after I was divorced. The fact that he mistreated my wife did not enter into the killing at all. The reason I killed him was because I was defending myself. The reason I

killed him was because I thought he was endangering my life, and I did it to save my life."

From this summary of the case we will proceed to discuss the assignments of error which are predicated on the charge of the court. Appellant contends that the following portion of the charge of the court is erroneous, to-wit: "In order to reduce the homicide to manslaughter upon the grounds of insulting words or conduct to a female relative, under the law the killing must result from passion engendered from such insulting words or conduct, and the killing must occur upon the first meeting with the slayer and the insulting party, after the slayer has been informed of such insulting words and conduct, and the issue of manslaughter is eliminated from the case. If you find that the defendant unlawfully killed the deceased, then you are instructed that you can only consider insulting words or conduct by the deceased to the wife of the defendant, if any, in determining whether the homicide was with implied or express malice, as implied and express malice has been heretofore defined in the charge of the court." It was not necessary for the court to have given this charge to the jury at all. While said charge, as given, is not drawn so as to plainly express the meaning intended, yet we gather from it that the court intended thereby to tell the jury that, while the insulting language or conduct of the deceased towards the wife of the defendant under certain circumstances would be adequate cause to reduce a homicide that would otherwise be murder to manslaughter, yet that such killing must occur on the first meeting between defendant and deceased, after defendant should be informed of such insults; and that, the proof in this case showing without controversy or question that there had been two meetings after such insults, and the communication thereof between deceased and defendant, such insulting language could not be considered as adequate cause. This, as we understand it, when the charge is so construed, is the law, and it was not error for the court to instruct the jury that they could not regard said insulting conduct as adequate cause. Moreover, it was not improper for the court to instruct the jury that said insulting conduct, not being adequate cause, could be looked to by them in determining whether the homicide was committed upon implied or express malice, giving the defendant the benefit of said insulting conduct to reduce the homicide from murder of the first degree to murder of the second degree. Appellant urges that the court committed an error in failing to charge on manslaughter. (It will be borne in mind that no charge was asked by the defendant presenting this issue, and no exception was taken to the failure of the court to charge on same at the time.) The contention of the appellant on this phase of the case is that the circumstances were such as to have required of the court a charge on this subject; that singly they might not be sufficient, but, taken together, they presented the issue of adequate cause. These circumstances, as instanced by defendant, are the previous insults to the wife of the defend-

ant, and his denunciations of him (defendant) while he was in the saloon. We have already seen that, the parties having met previous to the homicide, the insulting conduct ceased to be adequate cause. When the insults were offered in the saloon, although defendant heard the language of the deceased, he does not seem to have been excited by passion, nor did he then make any assault upon deceased, and the killing occurred some fifteen or twenty minutes thereafter. The law says that the provocation must arise at the time of the commission of the offense, and the passion must not be the result of a former provocation. Moreover, the defendant, by his own testimony, places this matter beyond question, as his evidence shows that his only purpose in shooting deceased was to save his own life, and that he acted purely in self-defense. Running through his testimony, it is apparent that he was cool and collected at the time; that he was unmoved by passion; that he watched each motion and action of the deceased; saw him with his left hand in his pocket, and thought he had a pistol, yet he did not make a move to draw his own pistol, until, as he says, "deceased should make a better break." But when he saw him throw his right hand to his hip pocket, he then determined that his life was in danger, and he shot deceased to save himself. The causes suggested by counsel, which they insist would indicate passion, he does not appear to have considered; nor does he appear to have been actuated by passion. The facts alluded to, standing either alone or taken collectively, are too weak, taken in connection with the circumstances of this killing, to have required a charge upon the subject of manslaughter. The court gave a full charge on the subject of self-defense. This was all that the circumstances demanded for him, and this is predicated solely upon his own testimony, which is merely based upon the hip pocket demonstration; and the proof on the part of the State is overwhelming that the deceased made no such demonstration, but took his watch out with his right hand, and was holding it, and speaking to his brother, when he was shot down by the defendant. Moreover, no arms whatever were found upon his person. There were but two issues in the case—that of murder in the first or second degree on the part of the State, and self-defense, based on the testimony of the defendant. Looking to the record in this case, no reasonable jury could doubt for a moment that the defendant, when he armed himself, and went to the door of Branch's saloon, placed himself there for the purpose of meeting deceased, and then shooting him down without warning, or else voluntarily engaging with him in a conflict with deadly weapons, in which one or both might be killed. The jury appear to have taken the more lenient view of the question, and gave him only murder in the second degree, when they would have been amply justified in finding him guilty of a graver offense. The judgment is affirmed.

*Affirmed.*

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]