# FEBRUARY, 1912.

### REASON BURNS v. THE STATE.

#### No. 1364.   Decided February 7, 1912.

#### Rehearing denied March 20, 1912.

**1.—Murder—Charge of Court—Charge as a Whole.**

It is elementary that the whole of the charge of the court must be considered when objections are made thereto, and isolated sentences and paragraphs are not to be considered alone.

**2.—Same—Manslaughter—Adequate Cause—Passion.**

Manslaughter is a separate and distinct offense from either murder in the first or second degree, and the Legislature has provided that sudden passion and adequate cause are essential in manslaughter.

**3.—Same—Charge of Court—Manslaughter.**

In a homicide case, if the facts show that it is either murder in one of the degrees or perfect self-defense, the court is not required and should not charge the jury on manslaughter. Following Williams v. State, 2 Texas Crim. App., 387, and other cases.

**4.—Same—Case Stated—Charge of Court.**

Where the defendant had, in a former trial, been acquitted of murder in the first degree, and was tried again on the same indictment, and the evidence showed that the case was either murder in the second degree or complete self-defense, and that the issue of manslaughter was not in the case, there was no error whether the court's charge on manslaughter was defective or not; however, his charge on manslaughter was correct.

**5.—Same—Charge of Court—Murder in the Second Degree.**

Where, upon trial of murder, the court's charge on murder in the second degree did not take from the jury the question of manslaughter and require them to find the defendant guilty of murder in the second degree, as contended by the defendant, but was substantially in accordance with the statute and approved precedent, when considered as a whole, there was no error.

**6.—Same—Charge of Court—Manslaughter—Definition.**

While it may not always be appropriate to give the full statutory definition in the court's charge, yet, unless there is something in the charge that is wholly inapplicable to the case, it is not reversible error, and where the court submits manslaughter, it should give the statutory definition in substance of

what is meant by the phrase, "under the immediate influence of sudden passion."

**7.—Same—Charge of Court—Manslaughter—Provocation.**

Where, upon trial of murder, there was evidence that defendant had been informed of a wordy altercation between his brother and the deceased several hours before the homicide, and the court, in submitting the law of manslaughter, charged the jury that while the provocation causing the passion must arise at the time of the killing, that the jury, in determining the adequacy of the provocation, must consider all the facts and circumstances in evidence, in determining the condition of the defendant's mind at the time of the killing, the same was sufficient; and it would not have been proper to have singled out the fact of the prior difficulty between defendant's brother and the deceased; the court's charge not only giving the statutory definition of adequate cause, but what might be adequate cause in addition thereto.

**8.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence sustained a conviction of murder in the second degree, there was no error.

**9.—Same—Facts Stated in Opinion—Practice on Appeal.**

It is never intended to state all the testimony in the case in the opinion of the court, but where the testimony omitted from the opinion would not change the decision of the court, there is no reversible error, and a motion for rehearing is overruled.

Appeal from the District Court of Walker. Tried below before the Hon. S. W. Dean.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*W. W. Meachum* and *T. P. Buffington* and *A. F. Brigance,* and *Dean, Humphrey & Powell,* for appellant.—On the question of the court's charge on murder in the second degree: Greta v. State, 9 Texas Crim. App., 429; Ellison v. State, 12 id., 557; Smith v. State, 19 id., 95.

As to question of court's charge on provocation: Miles v. State, 18 Texas Crim. App., 156; Bracken v. State, 29 id., 362; Williams v. State, 15 id., 617; Neyland v. State, 13 id., 538; Johnson v. State, 22 id., 206; Vantreese v. State, 59 Texas Crim. Rep., 281; Barnes v. State, 61 Texas Crim. Rep., 37, 133 S. W. Rep., 887.

On the question of the court's charge on manslaughter: Bracken v. State, 29 Texas Crim. App., 362; Warthan v. State, 41 Texas Crim. Rep., 385; Spangler v. State, 41 id., 424; Miller v. State, 52 Texas Crim. Rep., 72; Green v. State, 58 id., 428.

On the question of the insufficiency of the evidence: Burns v. State, 58 Texas Crim. Rep., 463.

*C. E. Lane,* Assistant Attorney-General, and *E. A. Berry,* District Attorney, and *Hill & Elkins,* for the State.—On the court's charge on manslaughter: Graham v. State, 33 S. W. Rep., 537; Fitzpatric, 38 S. W. Rep., 806; Driver v. State, 65 S. W. Rep., 528; Simmons v. State, 23 Texas Crim. App., 653.

PRENDERGAST, JUDGE.—The appellant was indicted by the grand jury of Grimes County for the murder of Monroe Peteete and was tried at least once in that county. The venue was afterwards properly changed to Walker County where this trial occurred in which he was convicted of murder in the second degree and given the lowest penalty, five years in the penitentiary. He alone was tried in this case. In a former trial in Grimes County he and his brother, Walter Burns, who were jointly indicted, were tried together. The result of that trial was appealed by both of the appellants then tried, and reported in 58 Texas Crim. Rep., 463.

The testimony as stated in the opinion on that appeal was materially different from the testimony shown by the record in this case on this appeal. This record shows that some witnesses who testified on the other trial did not testify on this and that some who testified on this did not testify on the other trial. None of the questions raised and decided on the other appeal are in any way raised on this appeal. Therefore, the report of the other trial is no material aid in the decision on this appeal.

The appellant himself testified on this trial. His brother Walter did not. His father testified on the other trial but did not on this. Outside of the appellant, the State introduced three eyewitnesses to the killing. The appellant and these three witnesses were the only ones who saw it who testified.

It was agreed by all parties that Peteete was twenty-two years old when killed; that appellant was eighteen years old in January and that Walter was sixteen years old in February prior to the killing.

The killing occurred late Sunday evening, May 31, 1908, at a little village named Keith. It was shown, without contradiction, that on that Sunday, several miles from Keith, there was a meeting, preaching, at which there seems to have been a public dinner. A congregation of at least a few hundred people attended it. Appellant did not attend the meeting and was not at it all that day, but was at his father's home, which was his home, several miles from the meeting and some six miles from Keith. Walter Burns did attend that meeting. So did the deceased. The record in no way discloses that there was any ill feeling, or cause for it, between appellant and the deceased. The only evidence of any ill feeling between Walter Burns and deceased was stated by one of defendant's witnesses only, who testified on cross-examination by the State that he knew that Walter Burns was mad at Peteete and that Peteete did not like Burns. No other testimony appears in the record on this subject and none on the subject of any ill feeling between appellant and Peteete, prior to the killing.

It was shown that on the grounds at the church after the dinner there were several hundred people moving around back and forth just as would be the case at any other meeting of the character and kind. One of appellant's witnesses testified that when this moving around

and back and forth was going on, "Walter Burns and Monroe Peteete staggered together between the church and the water barrel. . . . I couldn't tell how that hitting of the shoulders together was done. They were just walking, Peteete was going towards the church and Burns was coming from the church and they walked together and hit their shoulders together. I didn't know which one done it." On cross-examination he testified: "I couldn't tell you which one of them struck his shoulder against the other. I don't know which one of them it was. I don't know whether it was the fault of either one of them. It is a fact that boys and men rush together in passing in a crowd of people. That frequently happens. I did not see anything unusual in the fact that they struck their shoulders together." Neither of the parties at that time stopped or said anything to the other. The deceased walked on some short distance to a crowd of boys, or young men, among them two of appellant's cousins, and was talking and laughing with them. No intimation that the talking and laughing was of anything that had occurred between Walter Burns and deceased. After standing talking with these young men or boys several minutes, Walter Burns quietly walked up to deceased, touched him on the arm, or at least approached him quietly, and told him he wanted to speak with him. They then walked off—some of appellant's witnesses say about eight steps and others about fifteen—together and then had some conversation. The evidence shows that at the time deceased was thus called off the people on the grounds were still milling around moving back and forth, just as they had been doing. In the conversation they then had the effect of the testimony of appellant's witnesses shows that it was in an ordinary tone of voice. Neither of them talked especially loud.

Another one of appellant's witnesses testified that when Walter Burns and deceased walked off and had this conversation, that deceased "pulled out his watch and looked at it and he told Walter the time of day it was. . . . He told him the time of day right at that time. . . . They were shaking their heads while they were talking out there, both of them were. There was a stump between them and Monroe Peteete had his foot up on the stump part of the time and was sort of leaning over that way. He didn't seem to be very angry. All that I saw to indicate that they were mad was that they shook their heads. I have seen people shake their heads lots of times when they weren't mad. Monroe Peteete was not doing anything to anybody that I saw when Walter Burns came there and carried him out of the crowd. Monroe was not doing anything to anybody that I saw. . . . All that I saw on the ground while I was there, he was behaving himself like a man. All I saw was when Walter Burns came up and called him off and the only word I heard was Monroe Peteete told Walter Burns the time of day. I couldn't hear Walter Burns ask him what time it was."

Another of appellant's witnesses testified: "I seen Walter Burns

walk up to the crowd there where we were standing and call Monroe Peteete off about eight steps, and the first I heard of the conversation, Monroe said he was ready right now and Walter backed up a step or two and said, 'I haven't got a thing,' and Monroe asked him if he would meet him at Keith at six o'clock, and Walter says 'I can,' and Monroe says, 'Go on,' and Walter says, 'I'm gone,' and turned around and went off." He further testified, on cross-examination by the State, that at the time Walter Burns called deceased off and had said conversation with him, Peteete was standing there talking to me and Jap Williams and Gus and Dave Burns. He was not bothering anybody on the face of the earth. . . . (Walter) Burns was not in the crowd that Peteete was in; he had not spoken to Burns before that as far as I know; Monroe Peteete and the other boys that were there in that crowd were just talking and laughing there. We weren't bothering anybody."

After what the witnesses had testified of what had occurred and was said between Walter Burns and deceased, they further show that they separated, Walter going to or about the water barrel and deceased going elsewhere to some friends. How long either or both of them remained on the grounds after that, none of the witnesses definitely state. Neither is it definitely stated what time all this occurred, but we gather from the record that it was soon after dinner.

Walter Burns went from there home, a few miles distant. Before reaching home he got from his brother-in-law, whose place he passed, a double-barrel shotgun. Appellant testified that with this gun he rode up in a fast trot or lope, about three or four o'clock to his father's lot where he and some companions were; called to him and asked him if he had some buckshot, or shot; he replied, without stating what he replied, and Walter then told him that Monroe Peteete had cursed him. No other explanation was then made to appellant of why he cursed him or of what he said in cursing him, or the occasion for it. When told this, appellant said to Walter, "Let's go to the house." Upon reaching the house appellant sat on the front gallery, Walter went into the room where his father was sick and had some talk with him therein. What this was is not disclosed anywhere in the record. His father got up out of the bed, dressed and came on the front gallery where appellant was, told appellant he was sick and could not go himself, and that he, appellant, would have to go with Walter. It is not disclosed by the record from whom or where the buckshot were procured on that occasion with which the gun was loaded that Walter had procured from his brother-in-law, but both barrels were then loaded with buckshot. Appellant further stated in his testimony that he did not remember whether he or his father suggested that he, appellant, get a gun and take it with him. Anyway, a messenger was sent to a negro's house, who lived a few hundred yards from appellant and his double-barrel shotgun, loaded with buckshot, was procured. Walter then turned over to appellant the brother-in-law's gun and he, Walter,

took the negro's gun. When his father insisted that appellant should go with Walter because he, the father, was sick and could not, appellant testifies, that he told him, his father, "I reckoned I could go if Walter would agree to listen to what I said." They then got on their horses and rode rapidly to Keith, riding either in a fast trot or lope. It was some six miles from appellant's home to Keith where the killing occurred. In going to Keith appellant and Walter passed their cousin who was returning home from said meeting and who lived one mile from where the killing occurred. This witness Wells, was a third cousin of Walter and appellant. While he had been summoned as a witness in the case and had attended the trials before, he never testified until this trial. He testified that some ten minutes before the killing appellant and Walter passed him on the road going to Keith; that they passed him in a trot; that they had been loping; that in about ten minutes he heard the firing of the guns when the killing occurred and testified that at that distance the smaller gun, or the gun that made the least noise, in his opinion, was first fired; that the others then followed rapidly. "I paid particular attention to these reports, as to which was the smaller report, first because I seen the boys (meaning appellant and Walter) going down there and I was listening for it, expecting it. I had seen Reason and Walter Burns going down there riding. They did not tell me where they were going. Lee Bob Allen told me. These boys did not tell me anything to indicate that they were going to kill anybody—nothing at all. They didn't say anything to me. . . . I said that their passing me caused me to listen for a gun shot. It was five or ten minutes after they passed me when I heard the gun shots to the best of my judgment. I guess these boys saw me when they passed. . . . I did not say anything to them. I saw them when they came back up the road. They said that they had had trouble and they didn't know whether they had killed him or not—didn't know whether they had killed Mr. Peteete or not. I· knew it was Peteete because they told me they had had trouble with Peteete. Reason told me that. Reason told me that they had had trouble with Mr. Peteete and they didn't know whether they had killed him or not. That is all I believe they said. They didn't stop with me at all. I was still there talking to some boys. Lee Bob Allen and Bud Schumacher were there."

Appellant further testified that when he and Walter started to Keith they passed their brother-in-law, Blount, and he said to them: "Don't have any trouble," and appellant told him: "I am not; I am going to reason it between Walter and Monroe, and that was all that was said there, and we went on down there and rode up to Monroe and I spoke to him and asked him how the dinner come out, and he said, 'All right, I reckon, by God,' and he said, 'I suppose you all come down here to settle it,' and I said, 'No, I came down to reason it between you and Walter, that we don't want to have no trouble,' and he said he didn't have no reason for us, 'You God damn sons of

bitches,' and that was about all the talking that was done between me and Monroe there, and he drew his pistol when he said that and shot at Walter, and the shooting began then between us all. Monroe Peteete fired the first shot." Appellant fired both barrels of his double-barrel shotgun loaded with buckshot at deceased and that Walter fired both barrels of his double-barrel shotgun loaded with buckshot at deceased. "When I got down there I had a double-barrel shotgun and Walter had one. We had it in our hands. Walter was off his horse and I was sitting there on my horse when the shooting began. Walter was down with his gun in his hand and I was on my horse with my gun in my hand and I tell that jury that that young man, Monroe Peteete, came out with a six-shooter in his hand and cursed both of us for God damned sons of bitches and shot at us. I don't know whether he shot twice or not. I swore on the former trial that he shot twice. I swear that he shot twice before I shot a single shot. I am certain of that. . . . I shot Peteete twice. I don't know exactly where I hit him the first time. I aimed at his breast and on up to his head. I don't know where I aimed at the last time. I don't recollect where. I don't know where I hit him the last time I shot at him. I swore that I aimed at him the first time." The State asked him: "What did you do after you had performed that peace mission?" He answered: "I got on my horse and struck a lope and hollered and waived the gun over my head. I didn't holler loud. I ran out through that village waiving my gun and hollering. I left the dead man there within 100 yards and I left him gasping for breath and I went off hollering and waiving my gun over my head. I did that killing with Robert Blount's gun (his brother-in-law's). I got it that evening. Walter brought it there to the house. I saw Blount as I went on back, I didn't meet him. He asked me what I had done. I passed him in the road and he asked me what I had done and I told him to go and see and that is all I said. I kept riding."

The State, among others, introduced two eyewitnesses to the killing, J. S. Harrison and his wife; they both, in substance, testified that they were on their front gallery; their house fronted the public road, very close to it, and immediately before the killing defendant and his brother Walter came riding by, each with a double-barrel shotgun; that they were both riding in a lope and as they passed their house appellant said to Walter, "You must get off your horse." As soon as they passed Harrison's house, just as appellant said this to Walter, they kind of separated, appellant staying on the west side of the road and Walter went to the right near a little house and jumped off his horse "and as soon as he got down he shot." "I saw Mr. Peteete standing when Walter shot. He was looking up at Reason Burns. I didn't see him move. Walter jumped off his horse and stood between his horse and the little house and fired. Of course, I saw the puff of smoke and when the first fire went off, Mr. Reason jumped off his horse and several shots went off right together. They turned then and

got on their horses as quick as they could and went up north toward their home. When they passed my house, Mr. Reason Burns was waiving his gun over his head. He waived it twice and hollered two loud yells. He was something over 100 yards from Peteete, the dead man, when he did that. He was right in front of my gate when he did that. . . . When they passed me they were going as fast as the horses could travel, seemed to be." This testimony, just quoted, was by J. S. Harrison. Mrs. Harrison, his wife, testified substantially the same thing. It was an open view, nothing to obstruct the view from where they were sitting on their gallery to where the killing occurred, about 100 yards away. They both immediately got up and went down there. When they got there, Mr. Harrison testified, that the deceased had a six-shooter in his right hand. There were three empty chambers and three chambers still loaded. He could not tell whether more than one had been recently fired or not. Another eyewitness who testified for the State said that at that time Mr. Harrison said that only one shot had been recently fired from the pistol but that there were three empty chambers. Neither appellant nor his brother Walter were struck by any shot from the deceased's pistol. Mr. Harrison testified that he found evidence of only one shot from the pistol; that he saw where this shot which was in range somewhat from where deceased was killed to Walter Burns; he saw where the one ball had struck the ground, glanced and struck the little house, back of where Walter stood, and it made an indentation in the side of the house, dropped to the ground and he found and picked up the ball. This was the only evidence as testified to where any of the balls from the deceased pistol were fired, if he fired more than one time.

Appellant introduced one witness who testified that he was some three or four hundred yards from where the killing occurred and heard the shots but did not see any shooting. He testified there were five shots and that in his opinion the first shot was from the smaller gun or pistol, or that the first shot that was fired made less noise than the others. From the whole of the testimony on this subject the jury were authorized to believe that the deceased fired only one shot. Some of the testimony tended to show that there was more than one shot. All of the testimony shows that the appellant and his brother both fired twice emptying both barrels of their double-barrel shotgun.

The testimony by the Harrisons shows that they heard none of the conversation that occurred between the deceased and the appellant and Walter, but from what they saw that some words were exchanged between them immediately before the killing. The testimony clearly shows that the deceased left the meeting where he and Walter had been along about the middle of the evening and rode from there to Keith with two companions, which was several miles from where the meeting was, and that this was the road that deceased would travel in going from the meeting to his home; that when he and his companions got to Keith they stopped, two of them hitching their horses and the other

turning his loose. They were on horseback; that they then sat on the front gallery or steps of Mr. Harrison's store which was about 100 yards from Harrison's house a short time; that they loitered about there for some time and then left the store. One of the companions of the deceased testified that they went from there to another neighbor's house, visiting him for a short time. They then after this visit went back to the store and about that time the appellant and his brother appeared on the scene, deceased then left his two companions and walked up towards the appellant and his brother, meeting them. Where the killing occurred it was open and nothing to obstruct the view from Harrison and wife or this State's witness, the companion of deceased, Tom Hewett. He claimed to have been looking at them the whole of the time. On direct examination, among other things, he testified: "The Burns boys came riding down the road, and I asked who they were—I seen them with the guns on Sunday evening. I asked Monroe Peteete and Bob Kellum who they were, and they said they were the Burns boys. These boys had double-barrel shotguns, each one of them had a gun, and they came down the road, and one came down the road and turned off to the left side of the road and one to the right, in a V shape, and that one that was on the left hand side of the road, he got down off his horse, and Monroe Peteete was standing talking to Reason Burns. When the Burns boys were coming down the road, Monroe Peteete got up and walked up meeting the boys, and when he got up there, he stopped and was talking to Reason Burns. He had walked up with his right side to Walter Burns and was standing talking with his left hand up this way( indicating) and his right hand on his hip, talking to Reason. He turned this way (indicating) and when he turned, Walter Burns shot him. He was shot right in here (indicating side) with one load, and just as soon as that gun fired, he was shot in the side. After Walter shot, Reason fired the next shot. Peteete shot after both Reason and Walter Burns had shot. He jerked his pistol from around on his side someway and threw it up and shot and staggered back. I will take that back. Before he shot, he staggered back a step or two from where he was standing, and jerked this gun and threw it up and shot. I know he shot once, but couldn't say that he shot any more. He turned around to the left like and was going off and when he turned, he fell with his back to them and his face was down the road. When he fell, Reason shot him in the back with a load of buckshot. That was the first shot that hit him after he hit the ground, and he shot from here (indicating about the knee) up with small shot. I examined the wounds on him. I washed him and dressed him—me and Henry Lamar washed and dressed him. I saw Monroe Peteete shoot once. That is all I could say he shot. He, fired that shot after both Reason and Walter Burns had shot. After he fired that shot, he just turned around to his left and made one or two steps and fell. He was shot twice after he fell. These boys shot him twice, once a piece. I examined the

wounds on him after he was shot. I washed and dressed him. He was shot right in here (indicating the hip and stomach) literally all to pieces, with buckshot. That shot was between his ribs and hip bone on his left side. They were buckshot. From long about here (indicating about the knee) clean on up to the belt of his pants, he was shot with small shot, on the back part of both legs. I found some shot holes in his back, I don't know how many—I never counted them. They were all over his back, from the belt of his pants on up. They were buckshot holes—them up there was (indicating) and them down here (indicating) was small shot. Either one or two buckshot hit him in the back of the head and one or two scalped him over the ear. There were no shot in front of his head. There were one or two scalped him over the right ear. He was lying on his left side and one or two scalped him over the ear and either one or two hit him in the back of the head, I don't remember which. Henry Lamar assisted me in dressing him. He is here. This killing happened in Grimes County, Texas, on or about the 31st day of May, 1908."

It is unnecessary to give a further detail of the testimony. This is sufficient to bring out what is applicable to the questions raised by the appellant.

There are no bills of exceptions to any of the proceedings whatever, except to the charge of the court. At a former trial the appellant was convicted of only murder in the second degree. So that on this trial the court in the charge only gave what was necessary of express malice and murder in the first degree so that the jury could determine whether or not the appellant was guilty of murder in the second degree. The court charged on murder in the second degree and what it took to make murder in the second degree. He also charged on self-defense in all of its phases as favorable to appellant as it could be under the law, and submitted all phases of it as to appellant himself and also as to appellant's rights in the way of self-defense as to the attack made or about to be made upon his brother Walter. He also charged the reasonable doubt as applicable to the whole case and as between murder in the second degree and manslaughter.

In order to properly present the questions raised by appellant's complaint of the court's charge it will be necessary to quote considerable of the charge and the appellant's objections thereto. This is quite lengthy but it seems it is necessary under the circumstances.

After stating the case to the jury and briefly defining murder in the first degree and express malice, and correctly defining implied malice, and what it took to constitute murder in the second degree, the court then charged as follows:

"9. Malice is also a necessary ingredient of the offense of murder in the second degree. The distinguishing feature, however, so far as the element of malice is concerned, is, that in murder in the first degree malice must be proved, to the satisfaction of the jury, by the evidence, beyond a reasonable doubt as an existing fact, while in murder

in the second degree malice will be implied from the fact of an un-
lawful killing.

"10.  Implied malice is that which the law infers from or imputes
to certain acts, however suddenly done.  Thus when the fact of an
unlawful killing is established, and the facts do not show express malice
on the one hand beyond a reasonable doubt, nor tend to mitigate, ex-
cuse, or justify the act on the other hand, then the law implies malice,
and the murder is in the second degree; and the law does not further
define murder in the second degree than if the killing is shown to be
unlawful, and there is nothing in the evidence on the one hand show-
ing express malice, and on the other hand there is nothing in evidence
which will reduce the killing below the grade of murder, then the law
implies malice and the homicide is murder in the second degree.

"11.  Now in this case, if you are satisfied from the evidence be-
yond a reasonable doubt, that the defendant, Reason Burns, acting
together with Walter Burns as a principal, as the term principal is
herein defined to you, with a gun, did in the County of Grimes, State
of Texas, on or about the time charged in the indictment, unlawfully
shoot and thereby kill the said Monroe Peteete, and if you are further
satisfied from the evidence, beyond a reasonable doubt, that the defend-
ant in so doing, acted upon malice, but should not find from the
evidence beyond a reasonable doubt that he acted upon express malice,
then it will be your duty to find the defendant guilty of murder in
the second degree and to assess the proper punishment therefor.

"12.  The punishment for murder in the second degree is by con-
finement in the State penitentiary for any term of years the jury may
determine and state in their verdict, provided it be for not less than
five years.

"13.  The next lower grade of culpable homicide than murder in
the second degree is manslaughter.  Manslaughter is voluntary homi-
cide, committed under the immediate influence of sudden passion, aris-
ing from an adequate cause, but neither justified nor excused by law.

"14.  By the expression 'under the immediate influence of sudden
passion' is meant:

"(a) The provocation must arise at the time of the commission of
the offense, and that the passion is not the result of a former diffi-
culty or provocation.

"(b) The act must be directly caused by the passion arising out of
the provocation.  It is not enough that the mind is merely agitated
by the passion arising from some other difficulty or provocation, or
a provocation given by some other person than the person killed.

"(c) The passion intended is either of the emotions of the mind
known as anger, rage, sudden resentment or terror, rendering it incap-
able of cool reflection.

"15.  By the expression 'adequate cause' is meant such as would
commonly produce a degree of anger, rage, sudden resentment or
terror in a person of ordinary temper sufficient to render the mind

incapable of cool reflection. And any circumstance or combination of circumstances capable of producing such passion and which does produce such passion is in law 'adequate cause.'

"16. In addition to the above statement of 'adequate cause,' I also instruct you, that the following is 'adequate cause:'

"Any fact or circumstance or combination of facts and circumstances which actually produce in the mind of defendant sudden passion, such as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection.

"17. In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary not only, that 'adequate cause' existed to produce the state of mind referred to, that is of anger, rage, sudden resentment or terror, sufficient to render the mind incapable of cool reflection, but also, that such state of mind did actually exist at the time of the commission of the offense.

"18. But although the law provides that the provocation causing the passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation, if any, or cause, if any, to consider all the facts and circumstances in evidence in the case, and if you find, that, by reason thereof, the defendant's mind was, at the time of the killing, incapable of cool reflection, and that such facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation or cause satisfies the law, and so, in this case you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the killing, if any, and you are instructed that if by reason thereof the defendant's mind was at the time in such state of mind above referred to as to be incapable of cool reflection, then you are instructed to find that adequate cause existed to produce such passion and to reduce the homicide, if any, to the grade of manslaughter.

"19. Now, in this case, if you should find from the evidence beyond a reasonable doubt that the defendant, Reason Burns, on or about the time charged in the indictment, did shoot and thereby kill the said Monroe Peteete at the time he did so, the actions and words of the deceased, together with all the facts and circumstances in evidence had produced in the mind of the defendant sudden passion such as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection, and that under the immediate influence thereof, in the County of Grimes and State of Texas, the defendant shot and thereby killed the deceased, and if you are satisfied from the evidence beyond a reasonable doubt that such killing was neither justified nor excused by law, as hereinafter explained to you, then you should find him guilty of manslaughter and assess his punishment at confinement in the penitentiary for a term of years not less than two nor more than five, as you may determine and state in your verdict.

"20. All persons are principals who are present and act together

in the commission of an offense. And when an offense is actually committed by one or more persons, but others are personally present, and knowing the unlawful intent, aid by acts, or encourage by words or gestures those actually engaged in the commission of the unlawful act; all persons so aiding or encouraging are principal offenders, and may be prosecuted as such.

"21. Now, when an offense has been actually committed by one or more persons, the true criterion in determining who are principals is, did the parties act together in the commission of the offense, or did all aid and abet therein by actual presence and participation therein? If so, then all are alike guilty as principals. And you are charged that mere presence on the ground is not sufficient to make a party a principal, but if such party is present and participating in the offense as above explained to you, then he would be in law a principal.

"22. Should you find the defendant guilty of murder in the second degree or guilty of manslaughter, state of which offense you find him guilty and for whatever offense you may find guilty, if any, you will inflict the proper punishment for that offense as above directed.

"23. If you believe from the evidence beyond a reasonable doubt that the defendant is guilty of some grade of culpable homicide, but have a reasonable doubt as to whether the defendant is guilty of murder in the second degree or manslaughter, then you will give the defendant the benefit of the doubt and not find him guilty of any higher grade of offense than manslaughter."

This is followed, as stated above, by a complete submission of self-defense in all of its phases applicable to the testimony in the case. No complaint whatever is made of the court's charge on self-defense.

There are but two bills of exceptions by appellant to the court's charge. The first bill quotes the 9th, 10th and 11th paragraphs of the court's charge and excepts thereto on the following grounds: "For that under the instructions contained in said portions of the charge if the jury found an unlawful killing, they would be led to believe that they should find the defendant guilty of murder in the second degree and not of manslaughter, and the jury would probably infer from said portions of the charge that if there was an unlawful killing malice should be implied therefrom, and that a killing on implied malice amounts to murder in the second degree, and that said portions of the charge when taken together constituted an instruction that an unlawful killing is upon malice, and that if they found the killing was unlawful they would conclude that it was upon malice, and it would be their duty to find the defendant guilty of murder in the second degree and to assess a proper punishment therefor.

"Said 11th paragraph of the charge was then and there excepted to, for that the court had already, in paragraph 9 of the general charge to the jury, instructed the jury to presume malice from the fact of an unlawful killing, and said paragraph 11 of the charge in connection with paragraphs 9 and 10 thereof amounted to an instruction to find

the defendant guilty of murder in the second degree in case they found from the evidence beyond a reasonable doubt that the defendant unlawfully killed the deceased, thereby withdrawing from the consideration of the jury the law of manslaughter as set out in subsequent paragraphs of the charge. Said 11th paragraph of the charge was further excepted to in that the court failed to qualify the same by stating in substance that if the jury found the facts as stated in said paragraph and that the killing was not done under the immediate influence of sudden passion reducing it to manslaughter, it would be their duty to find the defendant guilty of murder in the second degree." The court in allowing this bill stated: "But take the whole charge instead of isolated paragraphs and parts of paragraphs and it covers the law fully."

By the other bill of exceptions appellant complains of the 14th to 18th paragraphs inclusive of the court's charge, quoting them, as follows: "To which portions of the charge, when given, the defendant then and there excepted, and especially excepted to subdivision (a) of the 14th paragraph of the charge wherein the jury were instructed that the provocation must arise at the time of the commission of the offense and that the passion is not the result of a former difficulty or provocation, because said subdivision (a) of the 14th paragraph of the charge was not qualified by an instruction to the jury that the provocation existing at the time of the commission of the offense, might have had its origin prior thereto, and because the jury were not instructed in said 14th, 15th, 16th, 17th and 18th paragraphs of the charge, or in any other portions of the charge, that in this case they might consider the report brought to the defendant by his brother, Walter Burns, as to the conduct of the deceased towards the said Walter Burns at the church on the day of the killing and the events that transpired at the home of the defendant, and particularly the command of the defendant's father that he go with his brother Walter to Keith and make an effort to settle the trouble between the said Walter and the deceased, and that they might consider also what occurred on the road from his father's home to the scene of the killing in connection with the acts, words and conduct of the deceased at the time of the killing, in determining whether there was provocation and adequate cause therefor, and whether the defendant was acting under the immediate influence of sudden passion arising therefrom at the time he shot and killed the deceased.

"Said portions of the charge were then and there further excepted to because there was no application therein or in any other part of the court's charge of the law of manslaughter to the facts of this case, and the court failed to set out in the charge the facts shown by the evidence which might be taken into consideration by the jury in determining whether there was adequate cause for sudden passion, and whether the passion of the defendant was aroused thereby, and whether acting thereunder he shot and killed the deceased."

These same objections to the court's charge are then substantially made in the motion for new trial. It is elementary and needs no citation to the decisions of this court that the whole of the charge must be considered when objections are made thereto; that isolated sentences and paragraphs are not to be considered alone. The court can not give all the law applicable to any case in one sentence or one paragraph. The whole of it, therefore, must be taken and considered when separate sentences, words or paragraphs thereof are attacked.

Manslaughter is a separate and distinct offense from either murder in the first or second degree. In order to make a homicide manslaughter, instead of murder in one or the other degrees, two things are made absolutely essential by our statute on manslaughter. The Legislature had the power and authority to expressly state what the offense of manslaughter was and its constituent elements. It has expressly made sudden passion and adequate cause essential to make manslaughter. If either of these are lacking the offense can not be manslaughter. Penal Code (new) articles 1128 to 1139, inclusive; McKinney v. State, 8 Texas Crim. App., 626; Clore v. State, 26 Texas Crim. App., 624; Hill v. State, 11 Texas Crim. App., 456; Neyland, 13 Texas Crim. App., 536; Childers, 33 Texas Crim. Rep., 509; Blackwell v. State, 29 Texas Crim. App., 194; Miller v. State, 31 Texas Crim. Rep., 609; Ex parte Jones v. State, 31 Texas Crim. Rep., 422. Many other cases might be cited but it is unnecessary.

It is also well established that in a homicide case if the facts show that it is either murder in one of the degrees or perfect self-defense, the court is not required and should not submit manslaughter to the jury. Williams v. State, 2 Texas Crim. App., 271; Grissom v. State, 4 Texas Crim. App., 374; Homberg v. State, 12 Texas Crim. App., 1; Self v. State, 28 Texas Crim. App., 398; Argus v. State, 29 Texas Crim. App., 52; Floyd v. State, 29 Texas Crim. App., 349; McGroth v. State, 35 Texas Crim. Rep., 413; Lentz v. State, 48 Texas Crim. Rep., 2; Jirou v. State, 53 Texas Crim. Rep., 18; Shelton v. State, 54 Texas Crim. Rep., 588; Ward v. State, 59 Texas Crim. Rep., 62, 126 S. W., 1146; Canon v. State, 59 Texas Crim. Rep., 398, 128 S. W., 141; Dougherty v. State, 59 Texas Crim. Rep., 464, 128 S. W., 398; Jennings v. State, 60 Texas Crim. Rep., 421; Wilson v. State, 60 Texas Crim. Rep., 1; Blount v. State, 58 Texas Crim. Rep., 509; Hardcastle v. State, 36 Texas Crim. Rep., 555; Eggleston v. State, 59 Texas Crim. Rep., 542, 128 S. W., 1105.

In our opinion the testimony in this case, as appellant had been acquitted of murder in the first degree, shows and justifies only murder in the second degree or complete self-defense and manslaughter was not in the case. So that whatever error there was by the court's submitting manslaughter, whether in a defective way or not, could not have resulted and did not result in any injury to appellant and even if there should have been some error in the court's charge on this subject it would not be reversible error. However, we will pass upon the

appellant's complaints to the charge of the court as raised and stated above.

Taken as a whole, the charge on murder in the second degree and manslaughter is a most admirable one and presents the case fully and fairly to the jury in all of its phases and we say generally that none of the appellant's complaints thereto, or criticisms thereof, point out any reversible error whatever. Those exceptions to the portions of the charge complained of by appellant's first bill, in our opinion, are not well taken, and the charge is not subject to the criticisms, or the construction thereon placed by appellant's exceptions. It did not take from the jury the question of manslaughter and require them to find the appellant guilty of murder in the second degree, without reference thereto, when taken as a whole and considered as a whole, which must always be done. The definition of implied malice and in connection therewith the definition of murder in the second degree is substantially in accordance with the statute and all of the decisions of this court on that subject. See section 1270, p. 490 of Judge White's Annotated Penal Code for a statement of a correct definition of implied malice and some of the authorities collated thereunder. These paragraphs of the court's charge complained of by this bill of appellant was followed, as shown above, by a complete charge on manslaughter and they both were followed by paragraphs 22 and 23 copied above from all of which, in our opinion, the jury could not have been misled and were not misled from considering whether appellant was guilty of manslaughter or not, even if manslaughter had been in the case.

As to the objections raised to the court's charge on manslaughter, shown by appellant's second bill above, it will be seen that subdivision (a) in paragraph 14, complained of, follows, almost literally, the first division of article 1129 (new) of the Penal Code. The additional words used therein "difficulty or," are peculiarly applicable to this case if manslaughter had been in it. While it may not always be appropriate to give the full statutory definition of an offense when the court is charging thereon, unless there is something therein that is wholly inapplicable to the case, it has always been held by this court that it was not reversible error to give the statutory definition. In submitting manslaughter it would not be complete without giving the statutory definition in substance of what is meant by "under the immediate influence of sudden passion" in defining manslaughter.

It will also be seen by the charge of the court above quoted that the court in the charge not only gave the statutory definition of adequate cause, but in addition thereto gave the further definition of what might be adequate cause, in addition to those given by the statute, which is strictly in accordance with the decisions of this court. Childers v. State, 33 Texas Crim. Rep., 509; Williams v. State, 15 Texas Crim. App., 617; Bonner v. State, 29 Texas Crim. App., 223; Renow v. State, 49 Texas Crim. Rep., 281; Millrainey v. State, 33 Texas Crim.

Rep., 577. It is needless to cite other cases on this point. Appellant's contention that subdivision (a) of said 14th paragraph of the court's charge, was not qualified by an instruction to the jury that the provocation existing at the time of the commission of the offense might have had its origin prior thereto and that in this connection they were not told that they might consider the report brought to appellant by his brother Walter as to the deceased's conduct towards him at the church and the events that transpired at his father's home, are without merit, for the charge of the court in very appropriate language, in the 18th subdivision thereof, which is a part of the charge on manslaughter, expressly tells them: "But although the law provides that the provocation causing the passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation, if any, or cause, if any, to consider all the facts and circumstances in evidence in the case if you find that by reason thereof the defendant's mind was, at the time of the killing, incapable of cool reflection and that such facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation, or cause satisfied the law, and, so in this case you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the killing, if any, and you are instructed that if by reason thereof, the defendant's mind was at the time in such state of mind above referred to as to be incapable of cool reflection, then you are instructed to find that adequate cause existed to produce such passion and to reduce the homicide, if any, to the grade of manslaughter, if you find that the homicide was either murder or manslaughter." It would have been improper in this, or any other case for the court to single out the testimony of what the witnesses had testified had occurred at the church and at the father's home. This would clearly have been upon the weight of the testimony and the court can no more do this against the State than it can against the appellant. The charge in this respect was as complete, ample and full as the court, under any circumstances of this case, could or should have given.

The only other complaint by appellant is, in effect, that the evidence is insufficient to sustain the verdict of the jury finding the appellant guilty of murder in the second degree. We have carefully gone over the evidence and there is no doubt in our mind that the evidence is amply sufficient to sustain the verdict. From the appellant's testimony, which was disputed by the State's, appellant made out a case of complete self-defense. The jury did not believe this, but believed the State's side. This court, under the circumstances, has no authority on that account to reverse the judgment.

It will, therefore, be affirmed.

*Affirmed.*

ON REHEARING.

March 20, 1912.

PRENDERGAST, JUDGE.—In deference to appellant's request in his motion for rehearing, we will state some of the evidence in addition to what was given in the original opinion and modify one statement therein.

It was not intended and never is, to state in the opinions of this court all of the testimony in any case when anything like the extent as in this case. The most that can be attempted to be done, is to give a brief statement from the whole evidence as this court reaches such conclusion after a consideration of the whole testimony. The statement of facts in this case has some forty-nine pages of typewritten matter. Hence, it will be seen that an attempt to give the whole of the testimony would be perfectly useless and entirely impracticable.

As stated above, we give this additional statement of some of the appellant's testimony, which was not stated in the original opinion. After testifying, as stated in the original opinion, that after his brother Walter and his father had the consultation, not in his presence, and his father dressed and came out on the gallery, stating that he was sick and could not go with his son Walter, and his request of appellant to go with his brother Walter; further testifying, he said: "I told him no, I didn't want to go and didn't want to have anything to do with it, and he kept on insisting and I told him I would go if Walter would agree to listen to me, and we decided to go." In another place, where this court, in the original opinion, stated that both shotguns— the one carried by appellant, the other by his brother—were loaded with buckshot, is an inaccurate statement. We think, as the substance of the whole testimony was given in the original opinion, this was immaterial and could not mislead, because, in giving the testimony of the State's witnesses it was shown that at least one load of the shots that were fired into the body of the deceased were small shots. However, we now modify the statement that "both guns were loaded with buckshot" so that, instead, we state that at least one of the guns was loaded with buckshot, and one barrel of the other, if not both, was loaded with smaller shot.

In addition to the statement in the original opinion, we further state that appellant, among other things, after he had testified, as stated in the original opinion: "When we (appellant and his brother) started on this mission of peace, I had a double-barrel shotgun and Walter had a double-barrel shotgun," we quote further of appellant's testimony, thus: "I didn't know what it was loaded with until after the shooting. I knew what it was loaded with after the shooting from where I shot him. I shot him in the head. I was cool and deliberate and I aimed the gun at him. I aimed it at his head, at his breast and head like." The uncontroverted testimony was that the buckshot

struck deceased in the head and breast and the smaller shot in his legs, and extending up to about his waist.

We have again considered the questions raised and decided in the original opinion and the additional authorities cited in the motion for rehearing and are of the opinion that they were all correctly decided in the original opinion. It is unnecessary to again discuss them. By appellant's motion for rehearing, nothing new, except the additional authorities, is called to our attention to in any way show that the case should be reversed.

The motion will, therefore, be overruled.